[No. B192656. Second Dist., Div. Seven. May 9, 2008.]

GARY K. WOLF et al., Plaintiffs and Appellants, v.
WALT DISNEY PICTURES AND TELEVISION et al., Defendants and
Appellants.

**COUNSEL**

Rintala, Smoot, Jaenicke & Rees, Peter C. Smoot, J. Larson Jaenicke and Michael B. Garfinkel for Plaintiffs and Appellants.

Shepphard Mullin Richter & Hampton, Martin D. Katz and Lisa N. Stutz for Defendants and Appellants.

**OPINION**

**PERLUSS, P. J.**—Gary K. Wolf, author of the novel Who Censored Roger Rabbit? (1981), and his company Cry Wolf!, Inc. (collectively Cry Wolf), appeal from the judgment entered after a jury awarded only limited damages in their breach of contract action alleging Walt Disney Pictures and Television (Disney) had failed to fully compensate Cry Wolf for its exploitation of the cartoon characters depicted in Wolf's novel. Cry Wolf contends the special verdict form unfairly highlighted Disney's theory of the case; the trial court erred in granting Disney's motions for nonsuit and directed verdict in connection with several of Cry Wolf's claims; and the court imposed an incorrect rate of prejudgment interest. Disney (including parent company and cross-complainant Disney Enterprises, Inc.) also appeals from the judgment, contending the trial court erred by submitting legal questions to the jury, denying its motions for judgment notwithstanding the verdict and awarding costs to Cry Wolf as the prevailing party. Although we reject most of the arguments raised in Cry Wolf's appeal and Disney's cross-appeal, we reverse the judgment to the extent it is based on an erroneous interpretation of the

term "Purchaser" in the parties' agreements and remand the matter for further proceedings necessary to correct the impact of that error.[1]

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### 1. *The Creation of the Roger Rabbit Characters*

In the novel Who Censored Roger Rabbit?, initially published in 1981, Wolf created the original characters of Roger Rabbit, Jessica Rabbit, Baby Herman and Eddie Valiant (the Roger Rabbit characters) and "Toontown," the place where Wolf's cartoon characters live. Shortly after the novel was published, Disney expressed interest in acquiring the rights to it. In 1981 Wolf agreed in a "short form option agreement" to grant Disney an option to purchase all rights in the novel, exclusive of certain limited publishing rights.

### 2. *The 1983 Agreement*

In 1983 Disney exercised its option to purchase the rights to the novel. The parties entered into a written purchase agreement (the 1983 Agreement) executed on Disney's behalf by Ronald Miller, then president of Walt Disney Productions. The 1983 Agreement, which superseded the 1981 "short form option agreement," expressly granted Disney the right to exploit the characters from the novel in a wide variety of contexts, including the right to produce television programs and motion pictures based on the book, the right to make and sell representations of Wolf's characters in connection with merchandising and advertising and to otherwise promote the Roger Rabbit franchise. Under the terms of the 1983 Agreement, Disney was under no obligation to exercise any of the rights granted to it and could assign or license any and all rights granted to it under the 1983 Agreement as it "s[aw] fit." In exchange, Disney agreed to give Wolf 2.5 percent of any motion picture net profits and 5 percent of the "gross receipts" it derived from its

---

[1] As discussed more fully below, the trial court erred in permitting the jury to decide the meaning of the term "Purchaser" in the controlling contract between Disney and Cry Wolf, and the jury's interpretation of that term was incorrect. Although that error requires a reassessment of the damages properly awarded to Cry Wolf and may affect other issues in the case, including determination of the prevailing party, the parties' briefing does not provide sufficient information for us to fully evaluate the nature and extent of that impact. Accordingly, we decide the issues on appeal as presented and leave to the trial court to determine on remand whether any further modifications in the judgment are required by our decision.

[2] This is the third time this case has been before us. The first two occasions involved writ proceedings prior to entry of the judgment. (See *Wolf v. Superior Court* (2003) 107 Cal.App.4th 25 [130 Cal.Rptr.2d 860] [denying petition for writ of mandate seeking to vacate order sustaining demurrer to breach of fiduciary duty cause of action without leave to amend]; *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343 [8 Cal.Rptr.3d 649] [granting petition for writ of mandate and directing trial court to vacate summary adjudication order].)

exploitation of the Roger Rabbit characters. The term "gross receipts" was not defined in the 1983 Agreement.

### 3. *The 1989 Settlement Agreement*

The 1988 movie Who Framed Roger Rabbit, coproduced by Disney, was based on Wolf's novel. Following the film's extraordinary success, a dispute arose between Wolf and Disney as to Wolf's entitlement to compensation for Disney's exploitation of the Roger Rabbit characters. Wolf, through Cry Wolf!, Inc., and Disney resolved their dispute by entering into a new agreement (the 1989 Settlement Agreement). In the 1989 Settlement Agreement Disney obtained the rights to Wolf's sequel to the novel. That agreement also granted Cry Wolf audit rights relating to Disney's accountings for the revenues derived from its exploitation of the Roger Rabbit characters. By its terms, the 1989 Settlement Agreement was intended to amend and supplement the 1983 Agreement, not to supplant or supersede it. As both Cry Wolf and Disney acknowledge, the 1989 Settlement Agreement did not alter the 1983 Agreement's provisions relating to Cry Wolf's entitlement to merchandising royalties as a percentage of Disney's gross receipts.

### 4. *Cry Wolf's Lawsuit*

Cry Wolf initiated the instant lawsuit in May 2001, after concluding that several audits of Disney's financial records had disclosed unreported and underreported revenue streams in relation to the merchandising of the Roger Rabbit characters. In the operative second amended complaint, Cry Wolf asserted causes of action for breach of contract, breach of fiduciary duty and breach of the implied covenant of good faith and fair dealing and sought declaratory relief and an accounting. As to the breach of contract claim, Cry Wolf alleged Disney had failed to report as part of its gross receipts the value in promotional benefits it had received from various agreements with third parties (such as Burger King, McDonald's and Eckerd/Kodak) in which Disney licensed to those companies the right to exploit the Roger Rabbit characters in exchange for the companies' agreement to promote the Roger Rabbit franchise. In addition, Cry Wolf alleged Disney had underreported or failed to report its gross receipts in connection with Disney's (1) sales of nationally licensed Roger Rabbit merchandise at various Disney venues; (2) sales of Roger Rabbit merchandise available exclusively at Disneyland, Walt Disney World and The Disney Store (venue-exclusive merchandise); and (3) domestic sales of records, tapes or compact discs connected with the Roger Rabbit characters. Finally, Cry Wolf alleged Disney had failed to compensate it for the nonmerchandising uses of the Roger Rabbit characters at Disney's foreign theme parks.

Disney responded to the complaint by filing a demurrer to the breach of fiduciary duty cause of action. The trial court sustained the demurrer without leave to amend on the ground there was no fiduciary relationship between Disney and Cry Wolf, a conclusion this court affirmed when we denied on the merits Cry Wolf's petition for a writ of mandate seeking to vacate the trial court's order. (See *Wolf v. Superior Court, supra,* 107 Cal.App.4th 25 (*Wolf I*).)

### 5. *Disney's Cross-complaint*

Following its successful demurrer to the cause of action for breach of fiduciary duty, Disney answered the complaint and filed its own cross-complaint asserting causes of action for declaratory relief, reformation, money had and received and unjust enrichment.[3] Disney alleged that it not only had adhered to its obligations under the 1983 Agreement and 1989 Settlement Agreement, but also had overpaid Cry Wolf. According to Disney, in computing Cry Wolf's royalties, it had erroneously paid a percentage of the gross receipts of all Disney entities involved in the exploitation of the Roger Rabbit characters instead of receipts earned by Walt Disney Productions (and its successor in interest, Disney Enterprises, Inc.), the Disney parent company that had entered into the 1983 Agreement and the 1989 Settlement Agreement. Disney sought return of those overpayments and a judicial determination in the form of declaratory relief that, under the 1983 Agreement, as amended by the 1989 Settlement Agreement, it had no obligation to pay Cry Wolf (1) the value of its promotional agreements for which it received only nonmonetary consideration; (2) a royalty in connection with its nonmerchandise-related use of the Roger Rabbit characters in its theme parks; or (3) a royalty in connection with its resale of nationally licensed merchandise.

### 6. *Disney's Summary Adjudication Motion*

In October 2002 Disney moved for summary adjudication of its claim seeking a judicial determination it had no obligation to pay Cry Wolf for nonmonetary consideration received in connection with its promotional agreements with third parties. Disney argued the clear and unambiguous meaning of the term "gross receipts" in the 1983 Agreement could only include receipt of cash money.[4] Wolf argued the term was ambiguous, proffering with his

---

[3] Wolf's complaint named Walt Disney Pictures and Television as a defendant. Disney's cross-complaint was filed by both Walt Disney Pictures and Television and Disney Enterprises, Inc., successor in interest to Walt Disney Productions, the entity that had entered into the 1983 Agreement and the 1989 Settlement Agreement.

[4] Disney based its argument for summary adjudication on paragraph 21 of the 1983 Agreement, which provides in part, "Purchaser's obligation to pay such sums to Seller [Wolf]

opposition papers expert testimony that the term "gross receipts" was commonly understood in the entertainment industry to refer to both the total amount of money and the value of all nonmonetary consideration received unless otherwise expressly specified in the contract.

The trial court granted Disney's summary adjudication motion. Cry Wolf petitioned this court for a writ of mandate, arguing triable issues of material fact existed as to the meaning of the term "gross receipts" and whether it was intended to include the value of nonmonetary benefits Disney received in connection with its promotional agreements. Following briefing and oral argument, we granted the petition and directed the trial court to vacate its summary adjudication order on the ground the evidence established the term "gross receipts" as used in the 1983 Agreement was ambiguous, and triable issues of fact existed as to whether that term was intended to include the value of nonmonetary benefits. (See *Wolf v. Superior Court, supra,* 114 Cal.App.4th at p. 1355 (*Wolf II*).)[5]

### 7.  The Bifurcated Jury Trial: Phase One

#### a.  Disney's successful motions for nonsuit

The case was tried to a jury in bifurcated proceedings. Phase one of the jury trial in March 2005 was directed to the intended meaning of certain contractual terms (such as "gross receipts") that had been determined to present triable issues of fact for the jury to resolve. At the conclusion of Cry Wolf's case-in-chief, the trial court granted Disney's motions for nonsuit on Cry Wolf's contract claims for a royalty in connection with the nonmerchandising uses of the Roger Rabbit characters at Disney's theme parks and a royalty on Disney's resale of nationally licensed merchandise.

#### b.  The phase-one special verdict and the court's order granting Disney's motion for a directed verdict on Cry Wolf's claim for breach of the implied covenant of good faith and fair dealing

After Disney concluded its evidentiary presentation and rested its case in phase one, it moved for a directed verdict on the claim for breach of the

shall not accrue unless and until monies with respect to which the same are to be paid shall have been received within the United States of America by, and placed at the unrestricted disposal of, Purchaser or Purchaser's subsidiary . . . ."

[5] Disney also brought a separate summary adjudication motion pursuant to Code of Civil Procedure section 437c, subdivision (f)(1), arguing it had no duty under paragraph 21 of the 1983 Agreement to pay Cry Wolf anything more than 5 percent of the licensing fee it received from its subsidiaries when they licensed the right to use the Roger Rabbit characters at Disney theme parks and resorts. The trial court denied that motion.

implied covenant of good faith and fair dealing. The trial court did not immediately rule on the motion. Meanwhile, the phase-one issues were submitted to the jury. In a special verdict form the jury was asked to decide certain contract interpretation issues, including whether the term "gross receipts" was intended to include the value of any nonmonetary consideration Disney received in connection with its promotional agreements.

The jury concluded the term "gross receipts" meant monetary consideration or nonmonetary consideration only "if and when it was turned into monies" by Disney. It rejected Cry Wolf's contention "gross receipts" included the value of nonmonetary benefits Disney received in connection with its promotional agreements with third parties. The jury also found the term "Purchaser" in the 1983 Agreement referred to Disney and its subsidiaries, rejecting Disney's contention the 1983 Agreement bound only Walt Disney Productions, its successors and assigns, and not its subsidiaries.

After the jury returned its special verdict, the court concluded there was no evidence from which a jury could find a breach of the implied covenant and granted Disney's pending directed verdict motion.

8. *The Bifurcated Jury Trial: Phase Two*

Phase two of the jury trial was directed to whether and in what amount Disney had underreported gross receipts relating to merchandise sales of the Roger Rabbit characters. In a second special verdict the jury determined Disney had underreported its gross receipts for venue-exclusive merchandise sold at Walt Disney World, Disneyland and The Disney Store by $1,063,391, $507,035 and $395,172, respectively, entitling Cry Wolf to $98,279.90—5 percent of those gross receipts. The jury also determined Cry Wolf was owed an additional $80,279 in royalties for record, tape and compact disc revenues involving the Roger Rabbit characters.

The court denied Disney's motions for new trial and for judgment notwithstanding the verdict. On June 5, 2006 the trial court entered judgment in favor of Cry Wolf. The judgment awarded Cry Wolf $395,362 in damages (including $216,803 that Disney had conceded at trial it had withheld based on a postdispute interpretation of the 1983 Agreement that the jury ultimately found erroneous), $157,049 in prejudgment interest and $116,256.56 for costs of suit. Both Cry Wolf and Disney filed timely appeals from the judgment.

## DISCUSSION

### Wolf's Appeal

1.  *The Phase-one Special Verdict Form Was Not Improper*

    a.  *Relevant proceedings*

To promote the theatrical and home video releases of the film Who Framed Roger Rabbit, as well as the Roger Rabbit franchise generally, Disney entered into promotional agreements in which it licensed the right to exploit the Roger Rabbit characters to a variety of retailers of consumer products. The agreements allowed the third parties to use the Roger Rabbit characters as "tie-in" promotions with their own products. For example, McDonald's featured the Roger Rabbit characters on its cups and promoted the Roger Rabbit movie and the Roger Rabbit franchise at the same time it advertised its own menu items. On some occasions Disney received cash for these licensing rights. Other times, Disney simply received substantial promotional benefits in lieu of cash.

A central issue in phase one was the meaning of the term "gross receipts," left undefined in both the 1983 Agreement and the 1989 Settlement Agreement, as it related to these promotional agreements. Cry Wolf contended the term included not only the monetary consideration Disney received in connection with licensing agreements, but also the value of any nonmonetary consideration obtained in connection with the promotional agreements, which Cry Wolf valued at $120 million. In support of that theory, Cry Wolf presented the trial testimony of David Held, a former executive vice-president of business and legal affairs at Paramount Pictures, who testified it was "custom and practice" in the entertainment industry to use the term "gross receipts" to refer both to "money and all other valuable benefits received."

Disney, for its part, argued the term "gross receipts" was intended to include only monies actually received and nonmonetary payments that were and could be "monetized," that is, recorded in the book of accounts. It offered evidence relating to the Writers Guild of America (WGA) basic agreement, which afforded screenwriters a merchandising royalty based on a percentage of "absolute gross," defined in the WGA basic agreement as "monies remitted." Disney's expert witness, Schuyler Moore, an entertainment and tax lawyer and adjunct professor of entertainment law at the University of California, Los Angeles, testified the WGA's definition of "absolute gross," a synonym for "gross receipts," had become the commonly understood meaning of "gross receipts" throughout the entertainment industry.

Both Cry Wolf and Disney submitted proposed special verdict forms. Initially Cry Wolf suggested the jury be given a single question: "Does the term 'gross receipts' as used in paragraph 21 of the 1983 Agreement and paragraph D.2 of the 1989 Agreement include the value of the noncash benefits or other consideration received by Disney as a result of its promotional agreements with third parties such as McDonalds and Coca Cola?" Disney insisted a special verdict that did not indicate how the jury arrived at its definition of gross receipts was insufficient. Thus, in addition to inquiring as to the ultimate issue—whether "the parties intend[ed] to use the phrase 'gross receipts' " to mean "monies received, including nonmonetary consideration or benefit received if and when turned into monies" or "monies received and the value of other consideration or benefit whether or not received and whether or not it is or can be turned into monies"—it proposed a special jury verdict form that included several additional questions directed to whether each of the individuals who negotiated the 1981 short-form option agreement, the 1983 Agreement and the 1989 Settlement Agreement was aware of the WGA basic agreement and took that agreement "into account" in negotiating those agreements on behalf of Cry Wolf and Disney.[6]

Cry Wolf argued Disney's questions relating to the WGA agreement were unduly repetitive and unfairly highlighted Disney's version of the case (that is, that the WGA's definition of "absolute gross" in the basic agreement reflected the common understanding of the term "gross receipts" in the entertainment industry). Ultimately, after several proposed revisions and an extensive hearing on the matter, the court concluded the special verdict form should contain questions relating to the WGA agreement "so that the Court can understand how [the jury] resolved various factual issues raised by the parties."

### b. *The special verdict form was not unduly prejudicial*

"The use of special interrogatories in a verdict form lies within the sound discretion of the trial court, and the court's determination will not be disturbed on appeal absent a clear abuse of discretion." (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 364 [48 Cal.Rptr.3d 875]; see *Masonite Corp. v. Pacific Gas & Electric Co.* (1976) 65 Cal.App.3d 1, 11, 12 [135 Cal.Rptr. 170].) Cry Wolf has failed to show the trial court abused its discretion by including the WGA-related questions in the special verdict form. Although the questions concerning the WGA were no doubt repetitive, they were not, as Cry Wolf suggests, tantamount to placing the trial court's imprimatur on Disney's theory of the case. To the

---

[6] The special verdict form included nine questions (with a separate question for each negotiator and each agreement) asking whether the particular negotiator "was familiar with the terms of the Writers Guild of America Basic Agreement (such as Exhibit 711)?"

contrary, the record shows the court spent a great deal of time and effort to create a form that would permit it—and the parties—to understand the jury's resolution of the underlying factual dispute relating to the "custom and practice" and common understanding of terms in the entertainment industry. To that end, in addition to inquiries directed to the negotiators' knowledge of the WGA basic agreement, the special verdict form asked a number of questions relating to the "custom and practice in the industry" independent of the WGA basic agreement, including whether, "[a]s used in the motion picture industry generally," the term "gross receipts" means "monies received" or "monies received and the value of other consideration or benefit" or whether there "is no custom and practice in the motion picture industry with respect to the meaning of gross receipts." The special verdict also inquired whether it was "customary to compensate participants in merchandising (such as Wolf)" based upon monies received or the value of promotional benefit whether or not that benefit can be turned into monies. Read as a whole, the special verdict form embraced both Disney's theories and Cry Wolf's theories relating to custom and practice in the industry. The references to the WGA agreement, a pertinent piece of evidence in the case, fall far short of an abuse of the court's broad discretion in these matters. (See *Red Mountain*, at p. 364; see also *Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1488 [81 Cal.Rptr.2d 252] ["selection of a more detailed special verdict form was well within the trial court's discretion"].)

2. *The Trial Court Did Not Err by Directing a Verdict in Favor of Disney on Cry Wolf's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing*

a. *Standard of review*

"A directed verdict may be granted, when, disregarding conflicting evidence, and indulging every legitimate inference which may be drawn from the evidence in favor of the party against whom the verdict is directed, it can be said that there is no evidence of sufficient substantiality to support a verdict in favor of such party . . . ." (*Newing v. Cheatham* (1975) 15 Cal.3d 351, 358–359 [124 Cal.Rptr. 193, 540 P.2d 33].) On appeal from a judgment based on a directed verdict in favor of the defendant, we review the evidence in the light most favorable to the plaintiff, resolving all conflicts and drawing all inferences in its favor and disregarding conflicting evidence. (*Colbaugh v. Hartline* (1994) 29 Cal.App.4th 1516, 1521 [35 Cal.Rptr.2d 213]; *Gouskos v. Aptos Village Garage, Inc.* (2001) 94 Cal.App.4th 754, 758 [114 Cal.Rptr.2d 558].) We must reverse the judgment if substantial evidence exists that would tend to prove each of the elements of the plaintiff's case. (*Heller v. Pillsbury Madison & Sutro* (1996) 50 Cal.App.4th 1367, 1392–1393 [58 Cal.Rptr.2d 336].) However, a "mere 'scintilla of evidence' does not create a conflict for

the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.' " (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 [253 Cal.Rptr. 97, 763 P.2d 948].)

> b. *There was no breach of the implied covenant as a matter of law*

█ It has long been recognized in California every contract contains an implied covenant of good faith and fair dealing that " 'neither party will do anything which will injure the right of the other to receive the benefits of the agreement.' " (*Kransco v. American Empire Surplus Lines Ins. Co.* (2000) 23 Cal.4th 390, 400 [97 Cal.Rptr.2d 151, 2 P.3d 1]; see also *Wolf I, supra,* 107 Cal.App.4th at p. 31.) This covenant is "read into contracts 'in order to protect the express covenants or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purpose.' " (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 373 [6 Cal.Rptr.2d 467, 826 P.2d 710] (*Carma Developers*).) For example, covenants to use "good faith" or "best efforts" to generate profits for a licensor are "routinely implied where the licensor grants exclusive promotional or licensing rights in exchange for a percentage of profits or royalties," even though the licensee does not expressly promise to do anything. (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 805 [48 Cal.Rptr.2d 747] (*Third Story Music*) [Although the contract does not promise in so many words that the licensee will use its best efforts, " 'such a promise is fairly to be implied. The law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. It takes a broader view today. A promise may be lacking, and yet the whole writing may be "instinct with an obligation," imperfectly expressed' " (quoting *Wood v. Duff-Gordon* (1917) 222 N.Y. 88 [118 N.E. 214] (Cardozo, J.))].)

However, the implied covenant will only be recognized to further the contract's purpose; it will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself. (*Carma Developers, supra,* 2 Cal.4th at p. 374 [" '[t]he general rule [regarding the covenant of good faith] is plainly subject to the exception that the parties may, by express provisions of the contract, grant the right to engage in the very acts and conduct which would otherwise have been forbidden by an implied covenant of good faith and fair dealing' " (second brackets in original)].) This principle is consistent with the general rule that implied terms cannot vary the express terms of a contract; if the defendant did what it was expressly given the right to do, there can be no breach. (*Ibid.*; see also *Tanner v. Title Ins. & Trust Co.* (1942) 20 Cal.2d 814, 824 [129 P.2d 383].) Thus, although it has been said the implied covenant finds "particular

application in situations where one party is invested with a discretionary power affecting the rights of another" (*Carma Developers*, at p. 372; see also *Locke v. Warner Bros., Inc.* (1997) 57 Cal.App.4th 354, 366–367 [66 Cal.Rptr.2d 921]), if the express purpose of the contract is to grant unfettered discretion, and the contract is otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and "can never violate an implied covenant of good faith and fair dealing." (*Carma Developers*, at p. 376 [lessor's termination of lease for lessor's own financial gain was not breach of implied covenant of good faith because it was expressly permitted by the lease and therefore within parties' reasonable expectations]; see also *Third Story Music, supra*, 41 Cal.App.4th at pp. 808–809.)

At trial, Cry Wolf argued that, if the term "gross receipts" was intended to mean only monetized benefits received by Disney in exchange for licensing the Roger Rabbit franchise, then Disney breached the implied covenant of good faith and fair dealing by purposefully orchestrating promotional agreements for which it received no monetary consideration. Cry Wolf asserts the trial court erred in directing a verdict on that issue, thus removing it from the jury's consideration. (See *Hicks v. E.T. Legg & Associates* (2001) 89 Cal.App.4th 496, 509 [108 Cal.Rptr.2d 10] [whether implied covenant has been breached "is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence' "].)

Contrary to Cry Wolf's contention, there were no disputed factual issues for the jury to decide. The question was not what Disney did, but whether it was authorized by the parties' agreements to do it. In light of Disney's unfettered discretion under the 1983 Agreement to license or not license the Roger Rabbit franchise as it "saw fit,"[7] Cry Wolf's attempt to limit that discretion by use of an implied covenant, a pure legal question of contract interpretation, is improper. (See *Carma Developers, supra*, 2 Cal.4th at p. 372; see also *Third Story Music, supra*, 41 Cal.App.4th at pp. 808–809.)

On this point, *Third Story Music, supra*, 41 Cal.App.4th 798, is illustrative. In *Third Story Music* a music production company (TSM) entered into an agreement with a record company, Elektra/Asylum Records, a division of Warner Communications, Inc. (Warner), to produce master recordings featuring performances by one of TSM's singer/songwriters, Tom Waits. Under TSM's agreement with Warner, Warner received the worldwide right to " 'manufacture, sell, distribute and advertise records or other reproductions

---

[7] Paragraph 7 of the 1983 Agreement states, "Purchaser [Disney] shall not be under any obligation to exercise any of the rights granted to Purchaser hereunder; and any and all said rights may be assigned by Purchaser, and/or licenses may be granted by Purchaser with respect thereto, as Purchaser may see fit."

(visual or nonvisual) embodying such recordings' " and to " 'lease, license, convey or otherwise use or dispose of the recordings.' " (*Id.* at p. 801.) The agreement also allowed Warner to " 'refrain from any or all of the forego-ing' " at its sole discretion. (*Ibid.*) In return for the rights it gave up, TSM received an initial payment and a percentage of the amount earned by Warner from its exploitation of the music once realized. (*Id.* at p. 802.) When Warner refused to license a recording to which Waits had objected, TSM sued Warner and Waits, alleging, among other things, breach of the implied covenant of good faith and fair dealing.

■ The trial court sustained Warner's demurrer to the implied covenant claim. The Court of Appeal affirmed, finding it would be improper to recognize an implied covenant that would contradict the unfettered discretion expressly bargained for in the agreement: "[C]ourts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforce-able, illusory agreement." (*Third Story Music, supra,* 41 Cal.App.4th at p. 808.) That is, so long as the agreement is supported by adequate consider-ation such that the grant of discretion does not render it illusory, the court will not recognize or enforce an implied term directly at odds with an express contractual grant of unfettered discretion. (*Id.* at p. 809.)

Here, as in the contract in *Third Story Music, supra,* 41 Cal.App.4th 798, the 1983 Agreement afforded Disney the unlimited discretion to grant (or not grant) to third parties licenses to exploit the Roger Rabbit characters. Cry Wolf's complaint that Disney's failure to receive monetary consideration in some (but not all) of its promotional agreements is unfair or unjust because it prevented Cry Wolf from receiving royalties in some circumstances is quite simply beside the point. " 'It is not enough to say that without the proposed implied covenant, the contract would be improvident or unwise or would operate unjustly. Parties have the right to make such agreements. . . .' [Citation.] [Cry Wolf] was free to accept or reject the bargain offered and cannot look to the courts to amend the terms that prove unsatisfactory." (*Third Story Music,* at p. 809; see also *Storek & Storek, Inc. v. Citicorp Real Estate, Inc.* (2002) 100 Cal.App.4th 44, 64 [122 Cal.Rptr.2d 267].)

Cry Wolf's effort to distinguish this case from *Third Story Music, supra,* 41 Cal.App.4th 798, is unpersuasive. Had Disney, like Warner in *Third Story Music,* simply elected not to exploit the rights granted to it under the 1983 Agreement, Cry Wolf agrees it would have no recourse against Disney. However, once Disney elected to enter into licensing agreements with third parties in connection with the exploitation of the Roger Rabbit characters, Cry Wolf argues, it had a duty to do so fairly and in good faith so as not to

deliberately thwart Cry Wolf's opportunity to obtain a royalty. That argument rests on a distortion of the language in the 1983 Agreement, which did not merely grant Disney the ability to refrain from exercising the rights conveyed, but also conferred the express authority to "grant licenses" to third parties in connection with the exploitation of the Roger Rabbit characters in any manner it "saw fit." As explained, recognizing an implied term that would limit the unfettered discretion given to Disney to license the characters as it saw fit would be at odds with the express terms of the agreement.[8]

Even if the 1983 Agreement were susceptible to the interpretation Cry Wolf advances and a covenant of good faith and fair dealing could be inferred to limit the discretion given to Disney in connection with the manner in which it licensed the Roger Rabbit characters, the directed verdict was still proper because no substantial evidence was presented from which a rational juror could find the covenant had been breached.

To establish a claim for breach of the implied covenant of good faith and fair dealing, Cry Wolf was required to show either Disney lacked subjective good faith in the validity of its act—licensing the characters to third parties for promotional benefits in lieu of monetary consideration—or the act was intended to and did frustrate the common purpose of the 1983 Agreement. (See *Carma Developers, supra*, 2 Cal.4th at p. 372 ["the covenant requires the party holding such [discretionary] power to exercise it 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract, interpreted objectively' "]; *Locke v. Warner Bros., Inc., supra*, 57 Cal.App.4th at pp. 365–367.) Cry Wolf argues there was sufficient evidence to find a breach of the implied covenant because the fact Disney entered into promotional agreements in which it received monetary consideration demonstrates Disney knew how to structure agreements that would enable Cry Wolf to receive a royalty. Cry Wolf also points to testimony from Disney executives that one of the reasons Disney entered into nonmonetary promotional agreements was to avoid having to account on its books for additional revenues. While Cry Wolf's limited evidentiary summary is accurate, nothing in this evidence supports the conclusion the nonmonetary promotional agreements were designed to frustrate Cry Wolf's right to a royalty or that all, or even most, of Disney's licensing agreements were structured to require only nonmonetary consideration to Disney. In fact, the evidence showed many promotional agreements involving the Roger Rabbit characters were entered into for monetary consideration, a portion of which was given to Cry Wolf as royalties, as required under the 1983 Agreement. There was also no evidence

---

[8] We highlighted this bargained-for discretion in our opinion in *Wolf I, supra*, 107 Cal.App.4th 25, in which we concluded that Disney did not owe Cry Wolf any fiduciary duty in exercising its discretionary rights under the 1983 Agreement. (See *id.* at pp. 32–33.)

Disney's nonmonetary promotional agreements were objectively unreasonable. In fact, the undisputed evidence at trial was such agreements were customary in the entertainment industry, made good economic sense and ultimately inured to Cry Wolf's benefit because they encouraged the purchase of movie tickets or merchandise.

Cry Wolf also asserts the jury could have inferred bad faith or improper intent solely from evidence Disney had failed or refused to produce for Cry Wolf's auditors copies of the nonmonetary promotional agreements. However, Disney's prelitigation statement of its position—that Cry Wolf was not entitled to any royalties based on nonmonetary promotional licensing agreements because they did not involve receipt of any money—standing alone, is simply not sufficient evidence of subjective bad faith or objective unreasonableness to defeat a directed verdict in this case, as the jury had already found, prior to the entry of the directed verdict, that Disney was correct on that issue and that "gross receipts" included only monetized benefits.[9]

### 3. *The Trial Court Did Not Err in Granting Disney's Motions for Nonsuit*

#### a. *Standard of review*

We independently review an order granting a nonsuit, evaluating the evidence in the light most favorable to the plaintiff and resolving all presumptions, inferences and doubts in his or her favor. (*Carson v. Facilities Development Co.* (1984) 36 Cal.3d 830, 838–839 [206 Cal.Rptr. 136, 686 P.2d 656]; *Margolin v. Shemaria* (2000) 85 Cal.App.4th 891, 895 [102 Cal.Rptr.2d 502]; see generally *People v. Ault* (2004) 33 Cal.4th 1250, 1266 [17 Cal.Rptr.3d 302, 95 P.3d 523] ["[A]ppellate review of trial court orders granting nonsuits, directed verdicts, or judgments notwithstanding the verdict—orders that finally terminate claims or lawsuits—is quite strict. All inferences and presumptions are against such orders."].) "Although a judgment of nonsuit must not be reversed if plaintiff's proof raises nothing more than speculation, suspicion, or conjecture, reversal is warranted if there is

---

[9] Implicitly acknowledging the absence of any evidence of objective unreasonableness or Disney's subjective bad faith, Cry Wolf insists it is unnecessary to show either. Citing *R.J. Kuhl Corp. v. Sullivan* (1993) 13 Cal.App.4th 1589 [17 Cal.Rptr.2d 425] and *Foley v. U. S. Paving Co.* (1968) 262 Cal.App.2d 499 [68 Cal.Rptr. 780], Cry Wolf asserts it need only show the defendant acted intentionally to benefit itself at the expense of the other contracting party. These two cases simply recite the well-established principle that conduct that is outside the expectations of the contracting parties and frustrates the purpose of the contract may give rise to a claim for breach of the implied covenant; thus they reinforce the point made above: If the conduct complained of was expressly bargained for, it cannot, by definition, be considered to be outside the reasonable expectations of the parties. (See *Carma Developers, supra,* 2 Cal.4th at p. 374.)

'some substance to plaintiff's evidence upon which reasonable minds could differ . . . .' " (*Carson*, at p. 839.) In other words, "[i]f there is substantial evidence to support [the plaintiff's] claim, *and* if the state of the law also supports that claim, we must reverse the judgment." (*Margolin*, at p. 895.)

      b.   *The trial court properly granted nonsuit on Cry Wolf's contract claim concerning Disney's sale of nationally licensed merchandise*

Cry Wolf alleged Disney had breached paragraph 2(h) of the 1983 Agreement when it refused to pay a percentage royalty on any revenue obtained from its sale of "nationally licensed" Roger Rabbit merchandise, that is, merchandise manufactured by a third party pursuant to a licensing agreement with Disney and then purchased by Disney for resale at Disney venues. Among other things, paragraph 2(h) grants to Disney "[t]he sole and exclusive right to make, publish and vend, throughout the world, *or* to license others so to make, publish and vend, representations of the [Roger Rabbit] characters . . . in connection with articles of merchandise, or the advertising, display or exploitation of merchandise or in connection with any commercial activities." (Italics added.)

The trial court concluded as a matter of law paragraph 2(h) granted Disney two distinct merchandising rights: the right to "make, publish *and* vend" the Roger Rabbit merchandise itself and the right to license to others the right to make, publish *and* vend the merchandise. When Disney makes the merchandise and sells it, Disney owes Cry Wolf a percentage of the revenue from those sales. When Disney does not make and sell the merchandise itself, but licenses the right to do so to others, it owes Cry Wolf a percentage of the licensing fee. However, when Disney purchases merchandise made pursuant to one of the licenses it has granted and sells it as a retailer at Disney venues, it is neither "making, publishing and vending" nor licensing others to make, publish and vend. Rather, it is acting like any other retailer who would buy nationally licensed merchandise from a wholesaler or manufacturer.

Cry Wolf acknowledges the issue is one of contract interpretation, but contends the 1983 Agreement generally, and paragraph 2(h) in particular, are reasonably susceptible to the interpretation it advances—that Cry Wolf is entitled to a portion of the revenues from Disney's sale of nationally licensed merchandise. Thus, Cry Wolf argues it was error to remove this issue from the jury by granting the motion for nonsuit.

■    The rules governing the role of the court in interpreting a written instrument are well established. The interpretation of a contract is a judicial function. (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69

Cal.2d 33, 39–40 [69 Cal.Rptr. 561, 442 P.2d 641] (*Pacific Gas & Electric*).) In engaging in this function, the trial court "give[s] effect to the mutual intention of the parties as it existed" at the time the contract was executed. (Civ. Code, § 1636.) Ordinarily, the objective intent of the contracting parties is a legal question determined solely by reference to the contract's terms. (Civ. Code, § 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible . . ."]; Civ. Code, § 1638 [the "language of a contract is to govern its interpretation . . ."].)

▪ The court generally may not consider extrinsic evidence of any prior agreement or contemporaneous oral agreement to vary or contradict the clear and unambiguous terms of a written, integrated contract. (Code Civ. Proc., § 1856, subd. (a); *Cerritos Valley Bank v. Stirling* (2000) 81 Cal.App.4th 1108, 1115–1116 [97 Cal.Rptr.2d 432]; *Principal Mutual Life Ins. Co. v. Vars, Pave, McCord & Freedman* (1998) 65 Cal.App.4th 1469, 1478 [77 Cal.Rptr.2d 479] [parol evidence may not be used to create a contract the parties did not intend to make or to insert language one or both parties now wish had been included].) Extrinsic evidence is admissible, however, to interpret an agreement when a material term is ambiguous. (Code Civ. Proc., § 1856, subd. (g); *Pacific Gas & Electric, supra,* 69 Cal.2d at p. 37 [if extrinsic evidence reveals that apparently clear language in the contract is, in fact, susceptible to more than one reasonable interpretation, then extrinsic evidence may be used to determine the contracting parties' objective intent]; *Los Angeles City Employees Union v. City of El Monte* (1985) 177 Cal.App.3d 615, 622 [220 Cal.Rptr. 411].)

When the meaning of the words used in a contract is disputed, the trial court engages in a three-step process. First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (*Pacific Gas & Electric, supra,* 69 Cal.2d at p. 37; *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 391 [46 Cal.Rptr.3d 668, 139 P.3d 56].) If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract. (*Pacific Gas & Electric,* at pp. 39–40; *Wolf II, supra,* 114 Cal.App.4th at pp. 1350–1351.) When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395 [75 Cal.Rptr.3d 333, 181 P.3d 142] [interpretation of written instrument solely a judicial function "when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence, or a determination was made based on incompetent evidence"]; *Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].) This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence (*Garcia v. Truck Ins. Exchange* (1984) 36

Cal.3d 426, 439 [204 Cal.Rptr. 435, 682 P.2d 1100]; *Parsons*, at p. 866, fn. 2)[10] or that extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation. (*Parsons*, at p. 865; *New Haven Unified School Dist. v. Taco Bell Corp.* (1994) 24 Cal.App.4th 1473, 1483 [30 Cal.Rptr.2d 469].) If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury. (*City of Hope National Medical Center*, at p. 395 ["when, as here, ascertaining the intent of the parties at the time the contract was executed depends on the credibility of extrinsic evidence, that credibility determination and the interpretation of the contract are questions of fact that may properly be resolved by the jury . . ."]; *Warner Constr. Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 291 [85 Cal.Rptr. 444, 466 P.2d 996] [it is a " 'judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence' "]; *Pacific Gas & Electric*, at pp. 39–40 [same].)

Here, the trial court admitted extrinsic evidence to determine whether the words in paragraph 2(h), in particular the phrases "make, publish and vend throughout the world" and "license others so to make, publish and vend," were ambiguous and, if so, whether the interpretation of that paragraph turned on the credibility of extrinsic evidence. Finding no conflict in the extrinsic evidence, the court decided the meaning of paragraph 2(h) as a matter of law and granted the nonsuit.

In claiming the nonsuit was error, Cry Wolf relies exclusively on its interpretation of the testimony of Robin Russell, Disney's former senior vice-president of legal and business affairs and its principal negotiator of the 1989 Settlement Agreement, who testified it was her understanding when negotiating the 1989 Settlement Agreement that Cry Wolf was entitled to a royalty when licensed Roger Rabbit merchandise was sold at Disney venues. According to Cry Wolf, this testimony demonstrates the 1983 Agreement was susceptible to the interpretation it advanced concerning its right to a royalty in connection with Disney's sale of nationally licensed merchandise.

Whether or not the 1983 Agreement can reasonably be read as Cry Wolf suggests, the proper interpretation of paragraph 2(h) does not turn on *conflicting* extrinsic evidence as to the meaning of the terms "make, publish and vend," and there was nothing improper about the court, rather than the

---

[10] Chief Justice Traynor's opinion for the court in *Parsons v. Bristol Development Co.*, *supra*, 62 Cal.2d 1, adopted the position he had advocated in his dissent in *Estate of Rule* (1944) 25 Cal.2d 1 [152 P.2d 1003], that "it is only when conflicting inferences arise from conflicting evidence, not from uncontroverted evidence, that the trial court's resolution is binding [on an appellate court]. 'The very possibility of . . . conflicting inferences, actually conflicting interpretations, far from relieving the appellate court of the responsibility of interpretation, signalizes the necessity of its assuming that responsibility.' " (*Parsons*, at p. 866, fn. 2, quoting dissenting opinion in *Estate of Rule*, at p. 17.)

jury, deciding the contract interpretation issue. First, Russell, who was not an employee of Disney at the time of the 1983 Agreement and did not participate in its negotiation, testified simply it was her understanding that Disney was required to pay Cry Wolf a royalty when it sold Roger Rabbit merchandise at a Disney venue; she did not specify that entitlement included royalties for the sale of *licensed* Roger Rabbit merchandise.[11] More importantly, Russell explained that in negotiating the 1989 Settlement Agreement she and Cry Wolf simply agreed Cry Wolf's right to royalties for the merchandising sales of the Roger Rabbit characters at the theme parks as guaranteed under paragraph 2(h) of the 1983 Agreement would remain unaffected by the 1989 Settlement Agreement.[12] Thus, Russell's testimony that the parties agreed the 1983 Agreement would control Cry Wolf's merchandising rights has no impact on the question of the parties' intent as reflected in paragraph 2(h) of the 1983 Agreement. Because Cry Wolf points to no conflict in the extrinsic evidence as to the parties' objectively intended meaning of the terms at issue, the trial court's interpretation of paragraph 2(h) as a matter of law, rather than submitting the issue to the jury, was entirely proper. (See *City of Hope National Medical Center v. Genentech, Inc., supra,* 43 Cal.4th at p. 395; *Shaw v. Regents of University of California* (1997) 58 Cal.App.4th 44, 53 [67 Cal.Rptr.2d 850] [when extrinsic evidence not in conflict, question of contract interpretation appropriately decided as matter of law].)

Cry Wolf's appellate brief challenges the grant of nonsuit solely on the ground the contract interpretation issue should have been given to the jury. Cry Wolf does not argue, even if properly decided as a matter of law, the trial court's interpretation of paragraph 2(h) as applied to Disney's sale of nationally licensed merchandise was wrong. Accordingly, that argument is not properly before us. (See *Sunset Drive Corp. v. City of Redlands* (1999) 73

---

[11] Cry Wolf relies on the following testimony by Russell:

"Q: [W]hen Mattel was licensed to manufacture merchandise, some of that merchandise ends up back in the theme park and is sold in the theme park, right?

"A: Yes.

"Q: Okay. And during these negotiations [in 1989] you told Mr. Wolf's representatives that if Disney sold the Roger Rabbit plush in the theme parks they were entitled to merchandising royalty, didn't you?

"A: Yes. Because what we were demanding they do is waive their rights to the use of the Roger Rabbit characters in any way, shape or form, and in any of the Disney theme parks. However, knowing we sold Roger Rabbit dolls in the theme parks, I was not suggesting that they waive their rights [under the 1983 Agreement] to obtain their merchandise incorporation royalty on those dolls just because we sold them in theme parks."

[12] Russell testified that every time Cry Wolf's right to royalties for the sale of merchandise was discussed in connection with the negotiation of the 1989 Settlement Agreement, it was agreed to define the right as that "referred to or defined in the 1983 Agreement."

Cal.App.4th 215, 226 [86 Cal.Rptr.2d 209] [court need not consider issues inadequately raised in appellate briefs].)[13]

    c.   *The trial court properly granted Disney's motion for nonsuit on Cry Wolf's claim to a royalty for the nonmerchandising use of the Roger Rabbit characters at Euro Disney and Tokyo Disneyland*

Cry Wolf also challenges the order of nonsuit directed to its claim for compensation for Disney's nonmerchandise-related uses of the Roger Rabbit characters at its theme parks (for example, the use of the Roger Rabbit characters as walk-around characters or in connection with rides and attractions). Cry Wolf admits it waived all rights to the nonmerchandising uses of the Roger Rabbit characters at Disney theme parks in the 1989 Settlement Agreement.[14] However, Cry Wolf argues the waiver, which expressly covered use of the Roger Rabbit characters in "Walt Disney Productions Company's theme parks and attractions," was intended to govern use of those characters only in theme parks actually owned by Disney, not at "independent" theme parks such as Euro Disney in Paris or Tokyo Disneyland, neither of which is owned by Disney but rather operates under a license agreement entitling it to use the Disney name.

In arguing the nonsuit was improperly granted, Cry Wolf points to the testimony of David Colden, the lawyer who negotiated the 1989 Settlement Agreement on its behalf, who said Russell had expressly told him the waiver in paragraph E of the 1989 Settlement Agreement would not apply to any use

---

[13] Cry Wolf's position regarding the proper interpretation of paragraph 2(h) is, in any event, unpersuasive. The language of the 1983 Agreement was plain: Wolf conveyed to Disney two merchandising rights regarding the Roger Rabbit characters—the right to "make, publish *and* vend" and the right to license to others that right, that is, to "make, publish and vend" Roger Rabbit merchandise. To read the contract as allowing a royalty to Cry Wolf whenever Disney "makes, publishes *or* vends" a Roger Rabbit product absent any extrinsic evidence of such an intent, as Cry Wolf urges, would require us to rewrite the contract to confer a right not bargained for. That is not a proper judicial function. (*Rosen v. State Farm General Ins. Co.* (2003) 30 Cal.4th 1070, 1073 [135 Cal.Rptr.2d 361, 70 P.3d 351] [" '[W]e do not rewrite any provision of any contract, [including an insurance policy], for any purpose.' "]; *Certain Underwriters at Lloyds's of London v. Superior Court* (2001) 24 Cal.4th 945, 968 [103 Cal.Rptr.2d 672, 16 P.3d 94] [same].)

[14] Paragraph E in the 1989 Settlement Agreement provides, "[Cry Wolf] hereby waive[s] any claim, financial or otherwise, with respect to the use of the story, plot, theme or characters created in the [novel], sequels and/or Author Written Sequels in [Walt Disney Productions Company's] theme parks and attractions. Notwithstanding the foregoing, if the sale of a particular item of merchandise at the theme park(s) or attractions constitutes the exercise of [Walt Disney Productions Company's] merchandising rights pursuant to the terms of the Agreement, [Cry Wolf] shall be entitled to the Merchandising Royalty."

of the Roger Rabbit characters at theme parks not owned by Disney, such as Magic Mountain. Cry Wolf contends Colden's testimony alone is sufficient to defeat the nonsuit.

As was true with respect to paragraph 2(h) of the 1983 Agreement, the extrinsic evidence directed to the intended meaning of the phrase "Walt Disney Productions Company's theme parks" in paragraph E of the 1989 Settlement Agreement was not in conflict: Colden testified that, on Cry Wolf's behalf, he had initially requested, as a condition for granting Disney the sequel rights and entering into the 1989 Settlement Agreement, that Cry Wolf receive a royalty on the nonmerchandising uses of the Roger Rabbit characters at all Disney theme parks, including Euro Disney. Colden and Russell each testified Disney had adamantly refused that request, and Colden testified he believed he had "lost" on that issue at the time Cry Wolf agreed to the waiver in paragraph E of the 1989 Settlement Agreement. In addition, both Colden and Russell testified that, at the time the 1989 Settlement Agreement was entered into, both believed the phrase "Walt Disney Productions Company's theme parks" in the waiver included Euro Disney and the in-production, but not-yet-developed Tokyo Disneyland. There was no conflicting evidence of any intent to provide Cry Wolf with royalties for the nonmerchandise-related uses of his characters at either Euro Disney or Tokyo Disneyland. Instead, the only evidence was that both parties had agreed that theme parks "such as Magic Mountain" were excluded from the waiver. Thus, absent any conflict in the extrinsic evidence, the question whether "Walt Disney Productions Company's theme parks" meant parks "owned and operated by Disney" or something else was a matter of contract interpretation properly decided by the trial court as a matter of law. (See *City of Hope National Medical Center v. Genentech, Inc.,* *supra,* 43 Cal.4th at p. 395; *Parsons v. Bristol Development Co., supra,* 62 Cal.2d at pp. 865–866.)

Moreover, even if the waiver in the 1989 Settlement Agreement was reasonably susceptible to the interpretation suggested by Cry Wolf—that is, it was strictly limited to Disney-owned parks, and there was a conflict in extrinsic evidence on that point—that waiver did not confer on Cry Wolf any right to royalties for the nonmerchandising use of the Roger Rabbit characters that Wolf did not enjoy under the 1983 Agreement. At trial, Cry Wolf agreed, but claimed its right to such royalties arose from paragraph 2(h) of the 1983 Agreement, which granted Disney the right to exploit the Roger Rabbit characters "in connection with any commercial activities." Cry Wolf argued "commercial activities" in paragraph 2(h) must be interpreted to include nonmerchandising use of the characters at the theme parks. Yet Cry Wolf does not cite any extrinsic evidence in the record as to the customary meaning of "commercial activities" or the parties' intent that the term be interpreted to include use of the Roger Rabbit characters as walk-around characters at theme parks. In fact, the evidence in the record is to the

contrary. Wolf testified he understood the 1983 Agreement did not confer any right to a royalty for the nonmerchandising use of the Roger Rabbit characters at Disney theme parks.[15] Colden similarly testified that receipt of a royalty for theme park uses was a new negotiation point in the 1989 Settlement Agreement. Absent any conflicting evidence as to the meaning of "commercial activities" in paragraph 2(h) of the 1983 Agreement, the interpretation of that term in connection with the use of the Roger Rabbit characters for nonmerchandising purposes at theme parks was properly decided by the court as a matter of law.

As with its argument concerning nationally licensed merchandise, Cry Wolf argues only that the jury should have been permitted to decide the meaning of "commercial activities," as well as the meaning of the phrase "Walt Disney Productions Company's theme parks," not that, even if properly decided by the court as a matter of law, the court's interpretation of those terms in this context was erroneous. Accordingly, any argument to that effect has been forfeited. (*Sunset Drive Corp v. City of Redlands, supra,* 73 Cal.App.4th at p. 226.)[16]

### 4. *The Trial Court Did Not Err in Concluding the Proper Prejudgment Rate of Interest Is 7 Percent*

■ Civil Code section 3289, subdivision (b), provides that, when a contract entered into after January 1, 1986 does not provide for a legal rate of prejudgment interest, the prejudgment interest rate in a breach of contract action is 10 percent per annum. For contracts entered into prior to January 1, 1986, the legal rate of prejudgment interest is 7 percent per annum. (Cal.

---

[15] At trial Wolf testified to his understanding of the 1983 Agreement at the time he executed it:

"Q: I just want to make sure I understand. This 1983 Agreement you understood didn't result in compensation to you for theme park uses of the characters, correct?

"A: Correct.

"Q: But it was your understanding that even in the 1983 Agreement, you weren't going to participate in theme park uses of the characters, correct?

"A: Yes."

[16] Quite apart from Cry Wolf's express waiver of nonmerchandising uses of the Roger Rabbit characters in Disney theme parks contained in the 1989 Settlement Agreement and the procedural effect of Cry Wolf's failure to challenge on appeal the propriety of the court's interpretation as a matter of law, the undisputed evidence established the term "commercial activities" was limited to merchandising activities and did not encompass the nonmerchandising use of walk-around characters at theme parks. As we have explained, not only did Wolf's own testimony confirm this intended meaning, but also the evidence concerning the negotiations of the 1983 Agreement made clear there was no change in the intended designation of "commercial activities" between that agreement and the preceding 1981 short-form option agreement, which had limited Wolf's royalties to merchandising uses of the Roger Rabbit characters.

Const., art. XV, § 1 ["The rate of interest upon a judgment rendered in any court of this State shall be set by the Legislature at not more than 10 percent per annum. . . . [¶] In the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the State shall be 7 percent per annum."]; *Michelson v. Hamada* (1994) 29 Cal.App.4th 1566, 1585–1586 [36 Cal.Rptr.2d 343] [for agreements entered into prior to Jan. 1, 1986, that do not stipulate a rate of interest chargeable after breach, constitutional rate of 7 percent per annum applies].)

Cry Wolf contends the court erred in concluding the contract damages it received were based on the 1983 Agreement and in awarding prejudgment interest at the pre-1986 rate of 7 percent. It argues the controlling agreement is the 1989 Settlement Agreement, which "amended and reaffirmed" the 1983 Agreement, granted Cry Wolf audit rights and resolved certain allocation issues. Cry Wolf also notes the 1989 Settlement Agreement added Walt Disney Pictures as a signatory, the predecessor in interest to Walt Disney Pictures and Television, the entity sued in the instant matter. According to Cry Wolf, the 1989 Settlement Agreement, not the 1983 Agreement, governs the statutory rate of prejudgment interest to be applied.

Cry Wolf's breach of contract claims were unquestionably based on Disney's failure to pay the agreed-to percentage of gross receipts required by the 1983 Agreement. Had Cry Wolf's claims been predicated on the new terms in the 1989 Settlement Agreement, for example, the grant of literary and movie rights to the novel's sequel, our conclusion might be different. Similarly, if the 1989 Settlement Agreement had superseded the 1983 Agreement, we would agree it is the controlling contract. However, Cry Wolf's complaint relies expressly on the royalty rights granted under the 1983 Agreement; Cry Wolf's evidentiary presentation was largely directed to the meaning of paragraphs 2(h) and 21 of the 1983 Agreement; the 1989 Settlement Agreement expressly refers to the rights granted by the 1983 Agreement; and Cry Wolf's success at trial was based on the jury's findings concerning the 1983 Agreement. Because the 1983 Agreement provided the basis for Cry Wolf's claims at trial, the trial court properly awarded Cry Wolf prejudgment interest on those claims at a rate of 7 percent.

### Disney's Cross-appeal

1. *The Trial Court Erred in Allowing the Jury to Interpret the Term "Purchaser" in the 1983 Agreement*

The 1983 Agreement states it embodies the agreement between Gary Wolf, "referred to as 'Seller,' " on the one hand, and "Walt Disney Productions," "referred to as 'Purchaser,' " on the other hand. Paragraph 9 of the 1983

Agreement clarifies that the term " 'Purchaser' as used herein shall include the Purchaser herein named [Walt Disney Productions], and also its successors, privies and assigns."

Throughout this litigation, in motions for summary judgment or adjudication, motions in limine and motions for a directed verdict, Disney argued Cry Wolf was only entitled to a royalty on the gross receipts of the "Purchaser," identified as Walt Disney Productions, its successor, privies and assigns, not Disney's subsidiaries. The trial court, over Disney's objection, submitted that issue to the jury. The jury found in Cry Wolf's favor, concluding the term "Purchaser" included Disney's then present and future subsidiaries.[17]

Disney contends the trial court erred in submitting that question of contract interpretation to the jury and argues the court was required to decide the meaning of the term "Purchaser" in the 1983 Agreement as a matter of law. Cry Wolf, on the other hand, contends the issue was properly submitted to the jury because the term "Purchaser" is ambiguous, as reflected in evidence that, for more than 10 years, Disney operated in accordance with the view that "gross receipts of the Purchaser" meant that Cry Wolf was entitled to a royalty from the gross receipts earned by its subsidiaries and paid Cry Wolf pursuant to that understanding of its obligation. Disney admitted at trial it had knowingly made those payments to Cry Wolf over the years, but asserted it did so based on oversight and an erroneous interpretation of the contract and argued such an arrangement was never contemplated under the 1983 Agreement.

■ To the extent Disney contends the court erred in entertaining, even provisionally, extrinsic evidence concerning postcontract conduct to demonstrate an ambiguity, it is mistaken. As we explained in *Wolf II, supra,* 114 Cal.App.4th at pages 1350–1351, a contract apparently unambiguous on its face may still contain a latent ambiguity that can only be exposed by extrinsic evidence. (See also *Pacific Gas & Electric, supra,* 69 Cal.2d at p. 40 & fn. 8; *Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753–754 [8 Cal.Rptr. 427, 356 P.2d 171] (*Crestview*) [" '[p]arties to a contract have a right to place [any] interpretation upon its terms as they see fit, even when such an interpretation is apparently contrary to the ordinary meaning of its provisions' "].) In this regard, predispute, postcontracting conduct is admissible to demonstrate an ambiguity. (*City of Hope National Medical Center v. Genentech, Inc., supra,* 43 Cal.4th at p. 393 ["A party's conduct occurring between execution of the contract and a dispute about the meaning of the

---

[17] The first question in the special verdict form asked the jury to interpret whether the term "Purchaser" in the 1983 Agreement meant "Walt Disney Productions and/or Walt Disney Pictures and Television" only or whether that term also included all of Disney's "then existing and future subsidiaries."

contract's terms may reveal what the parties understood and intended those terms to mean. For this reason, evidence of such conduct . . . is admissible to resolve ambiguities in the contract's language."]; *Crestview*, at p. 753 [" '[t]he acts of the parties under the contract afford one of the most reliable means of arriving at their intention . . .' "].)

■ Of course, that extrinsic evidence may reveal an ambiguity subjecting a contract to more than one reasonable interpretation does not mean resolution of that ambiguity is necessarily a jury question. Absent a conflict in the evidence, the interpretation of the contract remains a matter of law. (*City of Hope National Medical Center v. Genentech, Inc., supra*, 43 Cal.4th at p. 395; *Parsons v. Bristol Development Co., supra*, 62 Cal.2d at pp. 865–866; *New Haven Unified School Dist. v. Taco Bell Corp., supra*, 24 Cal.App.4th at p. 1483.) Here, the meaning of the term "Purchaser" was not dependent on the credibility of conflicting extrinsic evidence. Although Wolf presented evidence that, for more than 10 years, Disney had knowingly paid Wolf a royalty from the gross receipts earned by its subsidiaries, Disney did not dispute that fact. Instead, it claimed its payments were the product of a misunderstanding of its obligations under the controlling 1983 Agreement. There was no "conflict" in the evidence of Disney's predispute conduct, and thus no factual issue for the jury to resolve.[18] Absent such a conflict, the interpretation of the meaning of the term "Purchaser" was properly a judicial function; and the court erred in submitting this question to the jury. (See *Dore v. Arnold Worldwide, Inc., supra*, 39 Cal.4th at p. 391 [absent conflicting extrinsic evidence, question of contract interpretation is judicial function]; *Parsons*, at pp. 865–866 [same].)

2. *The Term "Purchaser" in the 1983 Agreement Does Not Include Disney Subsidiaries*

Because interpretation of the term "Purchaser" in the 1983 Agreement is a question of law, we would review de novo the trial court's interpretation of that term had it not submitted the question to the jury. (See *Parsons v. Bristol Development Co., supra*, 62 Cal.2d at p. 866 [when extrinsic evidence not in conflict, interpretation of contract is question of law reviewed de novo].) Accordingly, notwithstanding the trial court's error in failing to decide the

---

[18] Although Cry Wolf and Disney vigorously dispute the inferences to be drawn from Disney's predispute conduct—was it compelling evidence of the intended meaning of the term "Purchaser" or was it simply a mistake by individuals who were unaware of the negotiators' intent—the evidentiary facts themselves are not in dispute. Accordingly, the trial court's admission of this evidence did not create any issue for the jury to resolve. (*Garcia v. Truck Ins. Exchange, supra*, 36 Cal.3d at p. 439 ["It is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence"].)

question itself, we need not remand the matter on that point and instead proceed directly to determining the proper meaning of "Purchaser" as used by Disney and Cry Wolf.

Under the de novo standard of review, we conclude "Purchaser" in the 1983 Agreement was intended to include Walt Disney Productions, successors and assigns only, and not Walt Disney Productions's subsidiaries. This interpretation is based in the first instance on the express definition of the term "Purchaser" in the 1983 Agreement, which specifically includes Walt Disney Productions, its successors and assigns and does not mention subsidiaries. The plain meaning of the actual language used by the parties is emphatically reinforced by paragraph 21 of the same agreement, which delineates the royalties Cry Wolf is to receive when Disney exploits the characters or licenses others to exploit the characters. Paragraph 21 provides, "Purchaser agrees to pay to Seller a sum equal to five percent (5%) of Purchaser's gross receipts derived from the exercise of such rights, which, in the event of Purchaser's licensing of any such rights to others, shall be composed of Purchaser's royalties so derived from the licensee. In the event that such a licensee is a subsidiary of Purchaser, then such royalties received by Purchaser from such subsidiary shall be deemed to be not less than five percent (5%) of such subsidiary's gross receipts derived from the exercise of such rights."

Paragraph 21 thus guarantees Cry Wolf payment for use of the rights granted in three distinct ways: (1) If Walt Disney Productions exploits the Roger Rabbit characters itself, Cry Wolf receives a royalty equal to 5 percent of Walt Disney Productions' gross receipts. (2) If Walt Disney Productions licenses those characters to a third party to exploit, Cry Wolf receives 5 percent of the gross receipts Walt Disney Productions derives from the granting of the license. (3) If Walt Disney Productions licenses the same rights to one of its own subsidiaries, then a 5 percent minimum royalty is imputed to Walt Disney Productions in the event it receives less than that sum in consideration from its subsidiary; Cry Wolf is then entitled to 5 percent of that licensing fee paid by Disney's subsidiaries. In other words, the imputed minimum royalty guarantees Cry Wolf the same royalty percentage whether Walt Disney Productions licenses the characters to third parties or licenses it to one of its own subsidiaries.

As Disney notes in its arguments to this court, the choice of language in Paragraph 21 is highly significant. When the parties intended to identify "subsidiaries," they knew how to do so. Moreover, if "Walt Disney Productions" includes subsidiaries, the third category of exploitation identified in Paragraph 21—the so-called imputation protection provision—makes little sense: In effect, it would include a subsidiary "licensing" itself to utilize the

Roger Rabbit characters, a meaningless concept. Even more significantly, if Cry Wolf were entitled to a royalty on the gross receipts earned not only by Walt Disney Productions but also by its subsidiaries, there would be no need to include any imputation protection: Whether Walt Disney Productions exploited the character rights directly or licensed them to a subsidiary to exploit, Cry Wolf would simply receive 5 percent of the gross receipts actually earned by the entity utilizing the Roger Rabbit characters. Thus, when the term "Purchaser" is interpreted in light of the contract as a whole (see Civ. Code, §§ 1641 ["whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other"], 1638 [contract to be interpreted consistent with contractual language and to avoid absurdity]), and in particular in light of paragraph 21, it is plain Cry Wolf was entitled to a royalty on the earnings of Disney subsidiaries only indirectly, based on Walt Disney Productions' or its successors' or assigns' actual or imputed gross receipts, not those earned directly by its subsidiaries.

Cry Wolf argues interpreting paragraph 21 in this manner leads to a grossly unfair result, effectively rendering its entitlement to a 5 percent royalty meaningless. It offers the following illustration: If Disney were to license a third party to produce an item of merchandise and received a licensing fee of 10 percent of the third party's revenues, and the third party sold $1,000 worth of goods, Disney would be paid $100. Cry Wolf's royalty would be 5 percent of that figure ($5). However, if Disney were to create a merchandising subsidiary to do the same thing—to pay Disney 10 percent of its revenues for the right to license items of merchandise to independent third parties—and the subsidiary authorized a third party to manufacture and sell the merchandise in exchange for a 10 percent royalty, the subsidiary would earn 10 percent on the sale of $1,000 worth of goods by the licensee (or $100); the Disney subsidiary would then pay the Disney parent company 10 percent of that royalty ($10), and the Disney parent company would pay Cry Wolf 5 percent of that royalty ($0.50). Thus, according to Cry Wolf, the "exact same economic result" for Disney (receipt of $100 for licensing a third party to exploit the character rights) would result in a 90 percent diminution in Cry Wolf's royalty. Plainly, Cry Wolf urges, that is not the kind of "protection from a sweetheart deal" between parent and subsidiary bargained for in the 1983 Agreement.

Cry Wolf's hypothetical is troublesome, but the consequences of Cry Wolf's interpretation are equally problematic. Using its hypothetical—Disney licenses a new merchandising subsidiary, which in turn licenses a third party to manufacture and sell Roger Rabbit merchandise in exchange for a 10 percent royalty—if the third party sold $1,000 in licensed products, Cry Wolf would receive $5.50: 5 percent of the subsidiary's gross receipts (that is, 5 percent of $100), plus 5 percent of the fee paid by the Disney subsidiary to

the Disney parent (5 percent of $10). Yet, as discussed, if the Disney parent directly licensed a third party manufacturer, the same sales volume produces only $5 in royalties for Cry Wolf. To paraphrase Cry Wolf, plainly this bonus to Cry Wolf for an intracorporate transfer is not the kind of "protection from a sweetheart deal" the parties contemplated.[19]

Whatever the extreme hypotheticals Disney and Cry Wolf's lawyers may now generate, our task is to interpret the 1983 Agreement as intended at the time of contracting. Paragraph 21 plainly protects Cry Wolf from a "sweetheart deal," making any contract between Disney and one of its subsidiaries the economic equivalent of a licensing agreement between Disney and a third party. In either case, Cry Wolf is entitled to the gross receipts of the Disney parent company, whether those revenues are generated by a third party or one of its subsidiaries, not to the gross receipts earned at each level of the Disney corporate structure.

We reverse the judgment because it was based, in part, on an incorrect interpretation of the term "Purchaser," a question the trial court improperly submitted to the jury. On remand the trial court must reassess the damages awarded to Cry Wolf to the extent they were dependent on the erroneous interpretation of that contract term.

3. *The Trial Court Erred in Awarding $216,803 for Disney's Failure to Pay Cry Wolf a Percentage of Its Subsidiary's Gross Receipts Following Initiation of This Lawsuit*

After Cry Wolf filed this lawsuit, Disney ceased paying any royalties based on the gross receipts earned by its subsidiaries. After the jury concluded that Disney's litigation position regarding the proper interpretation of the term "Purchaser" in the 1983 Agreement was incorrect and the gross receipts of Disney subsidiaries were to be included in Cry Wolf's royalty calculation, the court awarded Cry Wolf $216,803, the amount Disney and Cry Wolf stipulated had been withheld based on Disney's postlitigation interpretation of the 1983 Agreement. In light of our conclusion that Cry Wolf's royalty payments under the 1983 Agreement did not include any entitlement to the gross receipts of Disney's subsidiaries, the trial court's award of this amount to Cry Wolf was erroneous.

---

[19] Moreover, as Disney observes in its reply brief, there was no evidence of the type of behavior ascribed to Disney in Cry Wolf's hypothetical, that is, the creation of subsidiaries for the sole purpose of evading its obligations under the 1983 Agreement. Indeed, as Disney concedes, such facts, if established, could give rise to a claim for breach of the implied covenant of good faith and fair dealing.

### 4. The Trial Court Did Not Err in Denying Disney's Motion for Judgment Notwithstanding the Verdict

#### a. Standard of review

■ The trial court's power to grant a motion for judgment notwithstanding the verdict is the same as its power to grant a directed verdict. (Code Civ. Proc., § 629.) "A motion for judgment notwithstanding the verdict may be granted only if it appears from the evidence, viewed in the light most favorable to the party securing the verdict, that there is no substantial evidence in support." (*Sweatman v. Department of Veterans Affairs* (2001) 25 Cal.4th 62, 68 [104 Cal.Rptr.2d 602, 18 P.3d 29]; see also *Tognazzini v. San Luis Coastal Unified School Dist.* (2001) 86 Cal.App.4th 1053, 1058 [103 Cal.Rptr.2d 790].) On appeal from the denial of a motion for judgment notwithstanding the verdict, we determine whether there is any substantial evidence, contradicted or uncontradicted, supporting the jury's verdict. (*Sweatman*, at p. 68; *Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1510 [65 Cal.Rptr.2d 266].) If there is, we must affirm the denial of the motion. (*Sweatman*, at p. 68; *Hauter v. Zogarts* (1975) 14 Cal.3d 104, 110 [120 Cal.Rptr. 681, 534 P.2d 377].) If the appeal challenging the denial of the motion for judgment notwithstanding the verdict raises purely legal questions, however, our review is de novo. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 284 [73 Cal.Rptr.2d 596] [ordinarily, when reviewing an order denying judgment notwithstanding the verdict, appellate court considers whether there is any substantial evidence to support verdict; however, when issue presented deals solely with legal question in context of undisputed facts, review of court's decision is de novo].)

#### b. Relevant proceedings

In connection with its contract claims, Cry Wolf asserted Disney had underreported its gross domestic sales of records, tapes and compact discs in its participation statements. In particular, Cry Wolf argued Disney had improperly allocated domestic revenues for those items in violation of a provision in the 1989 Settlement Agreement that prohibited Disney from allocating revenues if its characters appeared with other Disney characters on the same item of merchandise.[20]

After the close of evidence in phase two of the trial, Disney asserted for the first time, in connection with discussions with the court concerning

---

[20] The nonallocation provision in the 1989 Settlement Agreement states, "If an item of merchandise embodies both the likeness of a Gary Wolf character and the likeness of a [Disney] character, [Cry Wolf] shall be entitled to the full Merchandising Royalty for that item, with no allocation or reduction for the [Disney] character."

preparation of the special verdict form, that Cry Wolf's claim of underreporting for "records, tapes and CD's-domestic" revenue was barred by an incontestability clause in the 1989 Settlement Agreement because Cry Wolf had not submitted a written challenge to Disney's accounting records within the specified 36-month time limit.[21] In response, Cry Wolf, relying on documents admitted into evidence, argued it had satisfied the clause's requirements by submitting a reservation of rights in response to Disney's participation statements, advising Disney it had not been provided with sufficient information from which to determine if the statements were accurate.

The trial court concluded parol evidence was needed to determine whether Cry Wolf's reservation of rights could be considered an effective objection under the contract terms and refused to consider the issue because Disney had raised it too late in the proceedings.[22] The court removed the issue from consideration, ruling "the statute of limitations defense [is] no longer part of this case."

Notwithstanding the court's ruling, in its closing argument Disney argued the incontestability clause to the jury, not as a limitations defense, but as a failure to perform under the contract. Specifically, Disney argued, without objection by Cry Wolf or admonition from the court, that Cry Wolf violated the incontestability clause and thus could not demonstrate it had "fully performed" all of its obligations under the 1983 Agreement. In a special verdict the jury found Disney had underreported its revenues for records, tapes and compact discs and awarded Cry Wolf $80,279.

---

[21] Paragraph VI E of exhibit NP to the 1989 Settlement Agreement, the incontestability clause, provides, "Each [participation] statement shall be deemed conclusively correct and binding on Participant [Cry Wolf] as to the transactions reflected therein for the first time on the expiration of a period of 36 months after the date received. The inclusion of any item from a prior statement on a subsequent statement shall not render such prior-appearing item contestable or recommence the running of the applicable 36-month period with respect thereto. If Participant serves written notice on [Disney] within the applicable 36-month period, objecting in specific detail to particular items and stating the nature of the objection, then insofar as such specified items are concerned, such statements shall not be deemed conclusively correct and binding. . . ."

[22] In response to Disney's proposed special verdict form putting the question of the applicability of the incontestability clause to the jury, the court stated, "I cannot give this to the jury, because there isn't any evidence. You're focusing on your subjective side. What I'm trying to do is I'm trying to say, all right, we ask these jurors this question. What are they going to look at? They're ultimately going to get to the reservation of rights that was consistently submitted by Mr. Colden. Then what does that mean? Was this a reservation of your right to file an objection once you got the information from the Disney accounting people? . . . I think it would be unfair to now put this matter before the jury and ask them a question which they do not have the evidence to decide and which they could have gotten the evidence, because we had the witnesses here, and we're running out of time."

Disney moved for judgment notwithstanding the verdict, arguing the jury was not free to disregard the "undisputed evidence" that Cry Wolf had breached the incontestability clause and thus had not fully performed its obligations under the 1983 Agreement and the 1989 Settlement Agreement. (See *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group* (2006) 143 Cal.App.4th 1036, 1051 [49 Cal.Rptr.3d 609] [party seeking to prevail on breach of contract must prove its own full performance under contract or demonstrate its performance was excused].) Disney also argued the jury's finding it had breached the nonallocation provision in connection with the sale of records, tapes and compact discs was not supported by substantial evidence. The trial court took the motion for judgment notwithstanding the verdict under submission and then denied it without elaboration.

    c.   *Substantial evidence supports the jury's implied finding Cry Wolf complied with the incontestability clause and thus fully performed under the 1983 Agreement and the 1989 Settlement Agreement*

In challenging the court's denial of its motion for judgment notwithstanding the verdict, Disney does not object to the trial court's ruling removing the limitations defense from the case. Instead, it argues, because the evidence Cry Wolf failed to comply with the incontestability clause was undisputed, there is no substantial evidence to support the jury's implied finding that Cry Wolf had fully performed under the contract. Disney's argument, however, is predicated on the faulty premise its interpretation of the incontestability provision is necessarily correct and the evidence Cry Wolf consistently reserved its rights in response to Disney's participation statements and accountings was, therefore, insufficient to support the jury's implied finding. Yet that is precisely the issue the court held Disney had forfeited by its delay in raising the incontestability clause as a defense.

At trial Cry Wolf presented documentary evidence it had reserved its rights to object, arguing that reservation was, in effect, an objection to Disney's failure to provide it with proper documentation from which it or its auditors could make an informed judgment about the accuracy of Disney's participation reports. In reaching a verdict for Cry Wolf on this issue, the jury necessarily found, absent evidence from either party concerning the meaning of the contract clause or the effectiveness of a reservation of rights rather than a specific objection, the reservation was sufficient to comply with the incontestability clause. Whether the trial court denied Disney's motion for judgment notwithstanding the verdict on the ground substantial evidence supported this implied finding or on the ground the motion was an improper attempt to resuscitate a limitations defense it had already rejected is of no consequence. Either way, the motion was properly denied.

d. *Substantial evidence supports the jury's finding Disney
breached the nonallocation provisions of the agreement*

Disney also contends there is no substantial evidence to support the jury's finding it violated the nonallocation provision in connection with its royalty payments for sales of records, tapes and compact discs, arguing, as it did to the jury, the provision applies only to an "item of merchandise"—that is, a product captured by paragraph 2(h) of the 1983 Agreement. Records, tapes and compact discs, Disney argues, are not "merchandise," but are more appropriately considered "children's story-telling records," an item sufficiently distinguishable from "merchandise" that it warranted its own paragraph—paragraph 2(i)—in the 1983 Agreement.[23] In addition, Disney argues the nonallocation provision applies to an "item" of merchandise, not to multiple items of merchandise that are prepackaged together, as was the case with the records, tapes and compact discs at issue in this claim.

Disney contends only that substantial evidence does not support the jury's findings it breached the nonallocation provision. The record belies this contention. Disney's own participation reports and working documents, introduced into evidence, apparently showed that Disney reported revenue in connection with sales of Roger Rabbit records, tapes and compact discs as a single item of merchandise. Although Disney contested Cry Wolf's interpretation of these participation reports and argued they indicated allocations only when multiple items were prepackaged together, not when a Roger Rabbit character appeared together with another Disney character on the same "item," the jury was free to, and did, reject that characterization of the evidence, particularly in light of the absence of any evidence supporting Disney's explanation of what it meant by prepackaged items. Because substantial evidence supported the jury's findings, the trial court did not err in denying Disney's motion for judgment notwithstanding the verdict.[24]

---

[23] As discussed, paragraph 2(h) conveys the right "to make, publish and vend . . . or to license others so to make, publish and vend . . . representations of the characters created by [Wolf] . . . upon, in, and/or in connection with articles of merchandise . . . ." Paragraph 2(i) conveys the right "to make and/or cause to be made, and the sole right to perform, publish and vend . . . children's storytelling recordings based in whole or in part upon the work or any such motion pictures or adaptations or any parts thereof."

[24] Disney's additional argument records, tapes, and compact discs are necessarily excluded from "merchandise" as a matter of law is not well taken. Paragraph 2(m) of the 1983 Agreement makes clear that a product or item mentioned in one paragraph does not necessarily fall exclusively within that paragraph: "Any rights granted by any of the foregoing subparagraphs (a) to (k), inclusive, shall be deemed in addition to, and not in limitation of, any rights granted by any other of said subparagraphs." Thus, the fact the 1983 Agreement contains a separate paragraph for "merchandise" does not alone establish, as a matter of law, that items identified in paragraph (2)(i) are not also "items of merchandise" subject to the nonallocation provision.

### 5. On Remand, the Trial Court Should Exercise Its Discretion to Determine the Prevailing Party

Except as otherwise provided by statute, a "prevailing party is entitled as a matter of right to recover costs in any action or proceeding." (Code Civ. Proc., § 1032, subd. (b).) Code of Civil Procedure, section 1032, subdivision (a)(4), identifies four categories of prevailing parties for purposes of awarding litigation costs: "[T]he party with a net monetary recovery, a defendant in whose favor a dismissal is entered, a defendant where neither plaintiff nor defendant obtains any relief, and a defendant as against those plaintiffs who do not recover any relief against that defendant." (See also *Michell v. Olick* (1996) 49 Cal.App.4th 1194, 1198 [57 Cal.Rptr.2d 227].) "When any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not and, if allowed may apportion costs between the parties on the same or adverse sides pursuant to rules adopted under Section 1034." (Code Civ. Proc., § 1032, subd. (a)(4); see *Michell*, at p. 1198.)

Disney contends the trial court erroneously believed Cry Wolf was entitled to costs as a matter of right as the party with the "net monetary recovery."[25] Because its cross-complaint contained claims for declaratory relief on which it prevailed, Disney asserts this case presents a "situation other than as specified" in the statute and the prevailing party is properly determined by the court in its discretion. (Code Civ. Proc., § 1032, subd. (a)(4).)

Under the circumstances presented by this case, the prevailing party determination is properly a matter for the trial court's discretion. (See, e.g., *Lincoln v. Schurgin* (1995) 39 Cal.App.4th 100, 104–105 [45 Cal.Rptr.2d 874] [when plaintiff wins net monetary recovery but defendant prevails in its cross-action for declaratory relief, case presents circumstance not otherwise specified; in that case, determination of prevailing party is matter within court's discretion].) It is not apparent from the record before us whether the trial court exercised its discretion to award costs to Cry Wolf or believed it had no choice but to conclude that Cry Wolf, as the party with the net monetary recovery, was the prevailing party in the action. On remand, in light of our conclusion the term "Purchaser" does not include subsidiaries, we anticipate the net damages awarded to Cry Wolf may be reduced, perhaps significantly. Even if Cry Wolf maintains a net monetary recovery, in determining the prevailing party in the litigation the trial court should also

---

[25] Disney and Cry Wolf stipulated to the amount of costs to be awarded ($116,256.56), subject to Disney's objection that Cry Wolf was not the "prevailing party" in the litigation.

consider Disney's success on its declaratory relief claims and exercise its discretion to allow costs or not and, if allowed, to apportion them as appropriate.

## DISPOSITION

The judgment is reversed to the extent it is based on an improper interpretation of the term "Purchaser" in the 1983 Agreement, and the matter is remanded for further proceedings not inconsistent with this opinion. On remand the trial court should consider what impact, if any, our interpretation of the term "Purchaser" has on the other issues in the case, including the court's determination of the prevailing party. Each party is to bear his and its own costs on appeal.

Woods, J., and Zelon, J., concurred.

A petition for a rehearing was denied June 4, 2008, and the opinion was modified to read as printed above. The petition of plaintiffs and appellants for review by the Supreme Court was denied August 20, 2008, S164423.