Filed 10/19/15  Tabares v. EquiTrust Life Ins. Co. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DANIEL TABARES et al.,<br><br>　　　Plaintiffs and Appellants,<br><br>　　　v.<br><br>EQUITRUST LIFE INSURANCE COMPANY,<br><br>　　　Defendant and Respondent. | B254409<br><br>(Los Angeles County<br>Super. Ct. No. BC390195)<br><br>　ORDER MODIFYING OPINION<br>　AND DENYING REHEARING<br>　(NO CHANGE IN JUDGMENT) |

THE COURT:

The court has read and considered respondent's request for modification of opinion and appellants' petition for rehearing filed on October 13, 2015.  It is ordered that the opinion filed herein on September 28, 2015 be modified as follows:

On page 4, section 2 of the Factual and Procedural Background, the first full paragraph is deleted and the following paragraph is inserted in its place:

> The named plaintiffs purchased different EquiTrust annuities.  According to the operative complaint, Daniel and Rhodora Tabares were approached by defendant Joseph Sackey at their worksite, the Los Angeles County Metropolitan Transportation Authority (MTA).  Sackey held himself out as a financial planner and annuity specialist who had assisted more than 100 MTA

retirees find profitable investments for their government pensions. In May 2006 Sackey convinced Daniel, a 23-year employee of the MTA, to retire early and roll his entire government pension of more than $395,000 into a MarketValue Index annuity issued by EquiTrust. Based on Sackey's representations, Daniel understood he would begin to receive monthly interest payments of $2,500 shortly after issuance of the annuity. Contrary to that representation, the annuity purchased by Daniel did not provide for commencement of immediate payments. Further, instead of the high returns promised by Sackey, the annuity bore a minimum guaranteed interest rate ranging from 1.5 to 2 percent, and only 87.5 percent of Daniel's investment was guaranteed from loss. Any withdrawals from the annuity within the first 10 years of purchase were subject to substantial surrender charges of up to 12 percent. Daniel was never shown a sample contract before the sale. He never incurred a surrender charge or MVA.

There is no change in judgment. Appellants' petition for rehearing is denied.

_____

PERLUSS, P. J.          ZELON, J.          SEGAL, J.

Filed 9/28/15  Tabares v. EquiTrust Life Ins. Co. CA2/7 (unmodified version)
Appendix attached

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| DANIEL TABARES et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>EQUITRUST LIFE INSURANCE COMPANY,<br><br>Defendant and Respondent. | B254409<br><br>(Los Angeles County<br>Super. Ct. No. BC390195) |

APPEAL from orders of the Superior Court of Los Angeles County, Anthony J. Mohr and Lee Smalley Edmon, Judges.  Affirmed.

Law Offices of Robert S. Gerstein, Robert S. Gerstein; Gianelli & Morris, and Robert S. Gianelli, for Plaintiffs and Appellants.

Amy R. Bach and Daniel R. Wade for United Policyholders as Amicus Curiae on behalf of Plaintiffs and Appellants.

Reed Smith, Margaret M. Grignon, Robert D. Phillips, Jr., James C. Martin, Zareh A. Jaltorossian, Kathy J. Huang and Thomas A. Evans, for Defendant and Respondent.

_____

This class action was filed in 2008 by purchasers of EquiTrust Life Insurance Company's deferred equity-indexed annuities. Named plaintiffs Daniel and Rhodora Tabares, Judy L. Taylor, Elizabeth Young and Judith Gilbert appeal from orders granting EquiTrust's motion for summary adjudication of their contract claims, denying class certification of their claim under the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) (UCL) and denying their request to add Young and Gilbert as class representatives on the cause of action for declaratory relief. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Financial Products Sold Here*

The EquiTrust annuity products challenged in this action include the MarketValue Index, the MarketPower Bonus Index, the MarketBooster Index and the MarketTen Bonus Index. All are equity-indexed annuities, meaning that some portion of the premium may be allocated to one or more accounts that link the crediting of interest to the performance of the Standard & Poor's 500 stock index. Annuity purchasers may also allocate premiums to a fixed rate account, which credits interest to the annuity according to a preset fixed rate reset at the beginning of each year. EquiTrust sets a new renewal rate each year depending on a number of factors, although the annuity contracts identify a guaranteed minimum interest rate below which the fixed rate will never fall. Equity-indexed accounts include "index caps," which cap the interest rate a purchaser can accrue. Initial index caps are fixed for the first year of each annuity but are reset monthly or annually depending on the account selected by the purchaser. As with the fixed rate accounts, renewal index caps are calculated based on a number of cost factors and may not fall below a guaranteed minimum during the life of the contract. The contracts specify that at no point may the interest rate be a negative figure, even if the equity index suffers a loss (negative growth). Thus, when a purchaser allocates premiums to an equity-indexed account, the account is contractually guaranteed a return between zero percent and the index cap.

Three of the four annuity contracts also provided bonuses tied to the amount of premiums paid into the annuities. The contracts defined "Premium Bonus" as "the

2

amount, if any, equal to the Premium (the amount deposited by the purchaser within the relevant time period, usually one year) multiplied by the Premium Bonus Percentage shown in the Contract Data Page." Premium bonuses were added to the premiums to increase the total Accumulation Value (defined as the premiums paid as augmented by any premium bonuses, plus interest credited and less any withdrawals) of the annuity. As EquiTrust admits, it treats the bonuses it pays as a fixed cost factored into its calculation of the initial rate and the index caps. Based on these contracted rates, which are usually lower than the rates provided in a non-bonus product, EquiTrust recoups the cost of the bonus over time.

EquiTrust sold its annuity products through independent sales agents compensated by commissions that were calculated as a percentage of the premiums paid into the annuity contracts sold. Commissions were not deducted directly from purchasers' premium funds but, like premium bonuses, were considered fixed costs and were factored into the initial rates and caps.

Annuities carry an early withdrawal penalty known as a surrender charge. A surrender charge is calculated as a percentage of the Accumulation Value that decreases over time, typically 10 to 12 years, sometimes as long as 15 years. The longer an annuity holder waits to withdraw his or her funds, the smaller the withdrawal penalty becomes; when the annuity reaches maturity, the surrender charge disappears. Until then, with limited exceptions, an annuity holder only has access to the Cash Surrender Value of the annuity.[1] Under the terms of the contracts, the Cash Surrender Value is the greater of either (1) the Accumulation Value less a surrender charge multiplied by a Market Value Adjustment (MVA), a figure derived from a preset formula linked to the starting and

---

[1] EquiTrust's annuity contracts allow a holder to make annual withdrawals ("partial surrenders") of up to 10 percent of the full Accumulation Value. Moreover, if the annuity holder dies, the contracts specify that the full Accumulation Value is payable to the annuitant's beneficiary.

current value of United States Treasury bonds,[2] or (2) a Minimum Guaranteed Contract Value, which is calculated as a percentage of the premiums actually paid, excluding any premium bonuses and withdrawals.

The cover page of the annuities sold by EquiTrust contained a number of advisory statements, including the following "important notice to owners age 60 or older": "This contract may be returned within 30 days from the date you received it for a full refund by returning it to the insurance company or agent who sold you this contract. After 30 days, cancellation may result in a substantial penalty, known as a surrender charge. The surrender charges associated with this contract can be found on the contract data page." Also on the cover sheet, below the EquiTrust signatures, was the following caution: "Cash surrender values may increase or decreased based on the equity index and market value adjustment features of this contract. . . ." The contract data page in turn disclosed the premium paid, the premium bonus percentage and amount, the minimum interest rate applicable to the plan, the duration of the MVA in years and the applicable percentage of the surrender charge over time. A cover sheet from one of the EquiTrust annuities is reproduced as an appendix to this opinion.

2. *The Named Plaintiffs*

The named plaintiffs purchased different EquiTrust annuities. According to Daniel and Rhodora Tabares, they were approached by defendant Joseph Sackey at their worksite, the Los Angeles County Metropolitan Transportation Authority (MTA). Sackey held himself out as a financial planner and annuity specialist who had assisted more than 100 MTA retirees find profitable investments for their government pensions. In May 2006 Sackey convinced Daniel, a 23-year employee of the MTA, to retire early and roll his entire government pension of more than $395,000 into a MarketValue Index

---

[2] The MVA, which is expressed in the contract as a mathematical formula, adjusts the policy's cash surrender value based on fluctuations in interest rates between purchase and surrender. According to EquiTrust, the MVA compensates EquiTrust for the cost of liquidating long-term investments when a policy holder prematurely surrenders all or part of his or her annuity. The MVA can cause either an increase or decrease in the otherwise applicable surrender charge and is a common feature of indexed annuities.

4

annuity issued by EquiTrust. Based on Sackey's representations, Daniel understood he would begin to receive monthly interest payments of $2,500 shortly after issuance of the annuity. Contrary to that representation, the annuity purchased by Daniel did not provide for commencement of distribution payments until 2061 when Daniel would be more than 100 years old. Further, instead of the high returns promised by Sackey, the annuity bore a minimum guaranteed interest rate ranging from 1.5 to 2 percent, and only 87.5 percent of Daniel's investment was guaranteed from loss. Any withdrawals from the annuity within the first 10 years of purchase were subject to substantial surrender charges of up to 12 percent. Daniel was never shown a sample contract before the sale. He never incurred a surrender charge or MVA.

Judy Taylor purchased a MarketPower Bonus Index annuity from an independent agent in 2008. She was shown a sales brochure and signed a disclosure statement but was not provided with a sample contract before the sale. She never incurred a surrender charge or MVA.

Elizabeth Young, who was added as a named plaintiff in the fourth amended complaint, purchased a MarketPower Bonus Index annuity in 2006. She surrendered her annuity in 2007. Judith Gilbert, added as a named plaintiff in the fifth amended complaint, purchased a MarketTen Bonus annuity in 2008. Although she incurred some surrender charges when she surrendered her annuity in 2012, this loss was offset in part by application of the MVA, which decreased the surrender charge as a result of the steep declines in the market after she purchased the annuity.

3. *The Class Certification Proceedings*

Plaintiffs filed their initial class action complaint in May 2008 and third amended complaint in September 2009. The third amended complaint alleged that abuses in the sale of deferred annuities, typified by unlawful and deceptive sales tactics, had become a growing problem in California. According to plaintiffs, EquiTrust improperly shifted the cost of paying its agents' commissions to annuity holders by reducing the annuity's credited earnings; shifted the cost of paying a promised 10 percent bonus on some annuities to the holders by reducing the annuity's credited earnings; disguised a

5

significant portion of its surrender charge penalty by applying the MVA to hedge losses on interest rates; and failed to identify the MVA as a surrender charge on the cover page of annuities sold to seniors (age 60 or older), as required by Insurance Code section 10127.13 (section 10127.13).

Plaintiffs moved for certification of two classes in December 2009: (1) all California residents who had purchased one of four specified deferred annuity insurance contracts from EquiTrust; and (2) all California residents over the age of 60 who had purchased one of the four annuities. On August 2, 2010 the court granted certification on two claims: (1) the contract cause of action on the theory EquiTrust had breached the covenant of good faith and fair dealing by manipulating renewal rates and caps to recoup the costs of commissions and bonuses; and (2) the declaratory relief cause of action for the second (senior) class based on the alleged violation of section 10127.13. The court denied certification of the fraud and UCL causes of action as to both classes on the ground there was no evidence either Tabares or Taylor, the only two named plaintiffs at this point, had actually relied on misrepresentations made by EquiTrust and thus lacked standing under the UCL. With respect to Taylor, the court also found she was an inadequate class representative because of discrepancies between her deposition testimony and her signed declaration: Taylor remembered virtually nothing about the provisions of the annuity she had purchased or disclosures made to her about its provisions. Because Taylor was at the time the only named plaintiff aged 60 or older, the senior class was left without a named class representative.

In response to the certification order plaintiffs filed a motion seeking clarification or reconsideration with respect to the issue of reliance for the UCL claim and for leave to add a new class representative for the senior class. On January 26, 2011 the court denied the request for reconsideration on the reliance standard. The court emphasized that the alleged omission of information could not be shown because none of the proposed class representatives had reviewed the contracts. The court indicated it would reconsider

6

whether reliance was required for the "unlawful" prong of the UCL and directed the plaintiffs to provide a list of possible replacement class representatives.[3]

In response to the January 26, 2011 order plaintiffs filed a brief arguing reliance should not be required for a claim under the unlawful prong of the UCL based on EquiTrust's alleged violation of section 10127.13. Because this section is a remedial statute, the plaintiffs argued, noncompliance alone should establish a violation. As plaintiffs explained, inserting a reliance requirement in this setting would subvert the purpose of the law and encourage rather than "'suppress the mischief at which [the statute] is directed.'" (*Rand v. American Nat. Ins. Co.* (N.D.Cal. 2010) 717 F.Supp.2d 948, 957 (*Rand*).) The court rejected the argument, concluding the Supreme Court's decisions in *In re Tobacco II Cases* (2009) 46 Cal.4th 298 (*Tobacco II*) and *Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310 (*Kwikset*) require a showing of reliance to state a claim under the unlawful prong of the UCL.

Plaintiffs continued their efforts to identify a class representative for the senior class by filing a fourth amended complaint, which added Young as a plaintiff and senior class representative for the breach of contract and UCL classes. They again sought to amend the complaint to add Gilbert as a senior class representative. The court agreed to add both Young and Gilbert as representatives for the breach of the implied covenant claim but refused to add them as class representatives for the declaratory relief claim because they had previously surrendered their policies. The court also denied plaintiffs' request for reconsideration of the reliance requirement on the unlawful prong of the UCL in light of an intervening decision from this district, *Medrazo v. Honda of North Hollywood* (2012) 205 Cal.App.4th 1 (*Medrazo*), which held reliance was not an element of the claim.

In February 2013 EquiTrust moved for summary adjudication of the certified claims for breach of contract and breach of the implied covenant of good faith and fair

---

[3] Pursuant to this order the parties stipulated to a notice that was sent to senior policy holders seeking additional class representatives.

dealing. EquiTrust asserted the claim, however it was characterized, failed because the plaintiffs could not demonstrate an underlying breach of contract.

In May 2013, pending the hearing on the motion for summary adjudication, plaintiffs filed a renewed motion to certify their fraud and UCL causes of action and to clarify the previous class certification order as to whether the court had certified a claim for breach of the express promise to provide a bonus. After a hearing on October 28, 2013 the court entered an order denying the request to certify the fraud and UCL claims with Gilbert as a representative. The court concluded that, absent a change in circumstances, plaintiffs were barred from renewing their previous motion for certification of claims originally denied (see *Safaie v. Jacuzzi Whirlpool Bath, Inc.* (2011) 192 Cal.App.4th 1160, 1172) and their failure to seek leave to add Gilbert as a representative on these claims at the time she was added as a representative for the implied covenant class was fatal. The court also refused to allow plaintiffs "to expand the scope of the certified class" by proceeding on the theory that the bonus promised by EquiTrust (but recouped by the initial contract rates) was a breach of contract. The court ruled that claim had been waived by the failure to raise it in the first motion for certification.

Nonetheless, in an order issued December 16, 2013 the court considered and rejected both contractual theories, concluding the distinction between the express breach of contract claim and the breach of the implied covenant was irrelevant. The bonus conferred by the contract was defined as a credit to the Accumulation Value, and, as plaintiffs conceded, EquiTrust had duly credited each of the eligible accounts with the amount specified in the contracts. As to plaintiffs' theory EquiTrust breached the implied covenant by manipulating rates to recover the costs of the bonuses and commissions, the contract afforded EquiTrust the power to reset particular rates; and plaintiffs were unable to assert EquiTrust's rate setting was either unfair or had violated the terms of the contracts at issue. The bonuses and commissions were fixed, and amortized costs recouped in the initial rates and caps had been fully disclosed to, and accepted by, plaintiffs.

8

At a status conference on January 28, 2014, plaintiffs asked the court to decertify their cause of action for declaratory relief for lack of an adequate class representative, leaving the breach of contract claim as the only certified cause of action.

## CONTENTIONS

Plaintiffs contend the trial court erred as a matter of law (1) by concluding EquiTrust had not breached the annuity contracts or violated the implied covenant of good faith and fair dealing by setting rates at levels that negated its promise of bonuses and imposing the burden of high commissions on policyholders; and (2) by refusing to certify the UCL "unlawful" prong claim based on the class representatives' failure to demonstrate reliance. Further, plaintiffs contend the court abused its discretion by refusing to allow a former annuity holder who had surrendered her contract to serve as the class representative for the declaratory relief claim.

## DISCUSSION

1. *Summary Adjudication Was Properly Granted on the Breach of Contract and Implied Covenant Claims*

    a. *Plaintiffs' breach of contract claim is reviewable*

EquiTrust initially contends plaintiffs have failed to properly present any claim based on an express breach of contract because that claim was never certified for class action treatment and plaintiffs limited the issues in their notice of appeal to certified claims under the "death knell" doctrine. (See *In re Baycol Cases I & II* (2011) 51 Cal.4th 751, 757.) As EquiTrust points out, the court's April 2, 2010 certification order restricted the class contract claim to the theory that EquiTrust had breached the covenant of good faith and fair dealing by manipulating its rates over the life of the contract to recoup the bonuses credited to the annuity holders and the high commission rates paid to the selling agents. After the motion for summary adjudication was filed, plaintiffs sought to clarify the court's order had encompassed a claim for express breach of contract, a request the court denied as untimely. EquiTrust asserts plaintiffs did not challenge that ruling in this appeal.

9

While it is true the court ruled the request to certify an express breach of contract claim was untimely, EquiTrust's notice of motion for summary adjudication identified both causes of action, one for breach of contract and one for breach of the implied covenant of good faith and fair dealing. The notice asserted both causes of action had been certified by the court in its order of August 2, 2010. The court's order granting EquiTrust's motion for summary adjudication also addressed both causes of action, concluding the undisputed evidence established EquiTrust had performed its contractual obligations; the bargained-for limits on EquiTrust's discretion had been implemented; and EquiTrust had exercised the discretion conferred by the contract within the scope of those limits. Plaintiffs appealed from this order, as well as the order denying clarification and the order denying certification.

Notices of appeal, of course, are required to be liberally construed. (Cal. Rules of Court, rule 8.100(a)(2).) Because the parties have had an opportunity to fully brief this issue and in view of our obligation to review de novo the trial court's interpretation of the contract for either claim, we exercise our discretion to consider whether summary adjudication was properly granted on the breach of contract claim, despite EquiTrust's contention it was not properly certified. (See, e.g., *Canaan v. Abdelnour* (1985) 40 Cal.3d 703, 722, fn. 17 [whether to apply rule of forfeiture for failure to properly raise an issue "'is largely a question of the appellate court's discretion'"], overruled on other grounds in *Edelstein v. City and County of San Francisco* (2002) 29 Cal.4th 164, 183; *Japan Line, Ltd. v. County of Los Angeles* (1977) 20 Cal.3d 180, 184-185 [appellate court may consider issue despite "obvious impropriety" in a party's appellate procedure, provided the parties have had an opportunity to brief the question], revd. on other grounds (1979) 441 U.S. 434 [99 S.Ct. 1813, 60 L.Ed.2d 336]; *Greenlake Capital, LLC v. Bingo Investments, LLC* (2010) 185 Cal.App.4th 731, 740, fn. 6 ["whether the letter agreement itself is susceptible to severance analysis is a question of law we may properly consider for the first time on appeal"]; *Sheller v. Superior Court* (2008) 158 Cal.App.4th 1697, 1709 [parties permitted to raise new issues on appeal involving question of law;

10

"application of the forfeiture rule is not automatic; appellate courts have discretion to excuse such forfeiture"].)

b. *Standards of contract interpretation*

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties as it existed at the time they entered into the contract. (*Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; *Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; see Civ. Code, § 1636.) That intent is interpreted according to objective, rather than subjective, criteria. (*Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126 (*Wolf*).) When the contract is clear and explicit, the parties' intent is determined solely by reference to the language of the agreement. (See Civ. Code, §§ 1638 ["language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity"]; 1639 ["[w]hen a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible"].) The words are to be understood "in their ordinary and popular sense" (Civ. Code, § 1644), and the "whole of [the] contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.)

Although parol evidence is inadmissible to vary or contradict the clear and unambiguous terms of a written, integrated contract (Code Civ. Proc., § 1856, subd. (a); *Wolf, supra,* 162 Cal.App.4th at p. 1126), extrinsic evidence is admissible to interpret the agreement when a material term is ambiguous. (*City of Hope National Medical Center v. Genentech, Inc.* (2008) 43 Cal.4th 375, 395; see *Pacific Gas & Electric Co. v. G.W. Thomas Drayage & Rigging Co.* (1968) 69 Cal.2d 33, 39-40 [if extrinsic evidence reveals that apparently clear language in the contract is susceptible to more than one reasonable interpretation, it may be used to determine contracting parties' intent]; Code Civ. Proc., § 1856, subd. (g) [extrinsic evidence admissible to interpret terms of ambiguous agreement].) Whether an ambiguity exists is a question of law, subject to independent review on appeal. (*Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1351; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.)

11

As we explained in *Wolf, supra,* 162 Cal.App.4th 1107, when the meaning of words used in a contract is disputed, the trial court engages in a three-step process:  "First, it provisionally receives any proffered extrinsic evidence that is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.  [Citations.]  If, in light of the extrinsic evidence, the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid the court in its role in interpreting the contract.  [Citations.]  When there is no material conflict in the extrinsic evidence, the trial court interprets the contract as a matter of law.  [Citations.]  This is true even when conflicting inferences may be drawn from the undisputed extrinsic evidence [citations] or [when] extrinsic evidence renders the contract terms susceptible to more than one reasonable interpretation.  [Citations.]  If, however, there is a conflict in the extrinsic evidence, the factual conflict is to be resolved by the jury."  (*Wolf,* at pp. 1126-1127, fn. omitted; see *Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 439 ["[i]t is solely a judicial function to interpret a written contract unless the interpretation turns upon the credibility of extrinsic evidence, even when conflicting inferences may be drawn from uncontroverted evidence"]; *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 [same].)

  c. *Plaintiffs failed to establish a breach of contract by EquiTrust*

Plaintiffs' breach of contract argument is straightforward:  They contend the word "bonus" should be understood in its "ordinary and popular sense."  (Civ. Code, § 1644; see *Reilly v. Inquest Technology, Inc.* (2013) 218 Cal.App.4th 536, 554.)  Plaintiffs were promised a bonus they did not receive because the so-called bonus payments were recouped by EquiTrust through lower index credits on those annuities.  In other words, the higher the bonus percentage, the lower the return over time.  At minimum, they argue, the term "bonus" is ambiguous, and a triable issue of material fact that cannot be resolved on summary judgment exists as to whether EquiTrust breached the terms of the annuity contracts.

As the trial court pointed out, however, Civil Code section 1644 contains a crucial caveat:  "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; *unless used by the parties in a*

12

*technical sense . . .* in which case the latter must be followed.'" (Italics added.) The court observed, "the question is not, as Plaintiffs suggest, whether EquiTrust provided class members with 'a true bonus' as a layperson would understand it, but whether EquiTrust provided a 'Premium Bonus' as defined in the contract." As defined, the court concluded, there is no ambiguity in the contract and thus no basis for the admission of extrinsic evidence as to the contract's meaning.

This ruling was correct. The integrated contract identifies a premium bonus that is defined only with reference to the annuity's Accumulation Value. The purchasers received the premium bonuses promised in the contracts. That the individual annuities varied in ultimate credit accumulation based on whether a particular annuity included an upfront premium bonus or lower credits over time does not constitute a breach of contract; to the contrary, the rates were disclosed, as was the range of discretion afforded to EquiTrust by the contract. The perception by some purchasers they would receive a 10 percent bonus (with no cost to them or tradeoff in the promised return credits) reflects more than anything the lack of sophistication of those purchasers and their vulnerability to misleading sales tactics. It does not, however, give rise to a contract claim and, indeed, is inadmissible to vary the express language of the contract. (*See Wolf, supra,* 162 Cal.App.4th at pp. 1126-1127; see also *Cirzoveto v. AIG Annuity Ins. Co.* (W.D.Tenn. 2009) 625 F.Supp.2d 623, 627 [granting summary judgment to insurer on breach of contract claim based on promise of "bonus"; terms of policy were clear and unambiguous]; *Phillips v. American International Group, Inc.* (S.D.N.Y. 2007) 498 F.Supp.2d 690, 694-695 [rejecting contention word "bonus" barred insurer from altering interest rates to recoup bonus so long as rates complied with minimum rates contained in contract].)

The extrinsic evidence cited by the plaintiffs, moreover, does not in any way support a contention the contract's use of the word "bonus" was reasonably susceptible to the meaning they propose. Noel Abkemeier, who helped design the annuity for an actuarial company retained by EquiTrust, essentially testified the bonus products were designed with intrinsically lower rates in order to recover the upfront costs of the bonus:

"There's a tradeoff over a time horizon."[4]  This testimony is inherently consistent with the language of the contract.  (Cf. *Eller v. EquiTrust Life Ins. Co.* (9th Cir. 2015) 778 F.3d 1089, 1093 (*Eller*) [finding no duty to disclose to purchaser that annuity "may provide lower index credits than might have been available in an alternative product without the bonus feature"].)[5]

Accordingly, summary adjudication in favor of EquiTrust on the plaintiffs' breach of contract claim was proper.

### d. *There was no breach of the implied covenant of good faith and fair dealing as a matter of law*

California law recognizes in every contract, including insurance policies, an implied covenant of good faith and fair dealing.  (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720; *Gruenberg v. Aetna Ins. Co.* (1973) 9 Cal.3d 566, 575.)  In the insurance context the implied covenant requires the insurer to refrain from injuring its

---

[4]  EquiTrust objected to this testimony as inadmissible, and the court sustained the objection.  Plaintiffs did not appeal the ruling.  Nonetheless, it is relevant to our de novo determination of ambiguity.  (See *Cline v. Homuth* (2015) 235 Cal.App.4th 699, 705-706 ["'[E]ven if the trial court personally finds the document not to be ambiguous, it should preliminarily consider all credible evidence to ascertain the intent of the parties.  "The test of whether parol evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.'"'"]; accord, *Wolf, supra,* 162 Cal.App.4th at pp. 1126-1127.)

[5]  In *Eller, supra,* 778 F.3d 1089 plaintiff Harrington alleged EquiTrust's marketing of its MarketPower Bonus Index annuity violated the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1962(c) (RICO)), as well as Arizona law.  In rejecting the RICO claim, the court stated:  "[I]t is uncontested here that EquiTrust delivered precisely what it promised.  The 10% bonus was accurately described in the Annuity materials and properly credited to Harrington's account.  The bonus increased Harrington's accumulation value without requiring him to deposit additional funds, allowing him to withdraw more money without penalty than otherwise would have been possible.  The promise of a 'bonus' was thus not, as Harrington claims, illusory.  [Citation.]  Nor is it clear that Harrington would have been better off absent the bonus feature.  If the index credits were regularly low, Harrington's investment would outperform a non-bonus annuity that provided the possibility of higher credits.  The district court thus correctly concluded that use of the term 'bonus' was not fraudulent."  (*Eller,* at pp. 1093-1094, fn. omitted.)

14

insured's right to receive the benefits of the insurance agreement. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818.) "[T]he covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36; see *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342, 372 ["the covenant requires the party holding such [discretionary] power to exercise it 'for any purpose within the reasonable contemplation of the parties at the time of formation—to capture opportunities that were preserved upon entering the contract interpreted objectively'"].)

As a general rule, as the trial court recognized, there can be no breach of the implied covenant of good faith and fair dealing if no benefits are due under the policy or contract: "[T]he covenant is based on the contractual relationship between the insured and the insurer. . . . Absent that contractual right [to policy benefits], the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.'" (*Waller v. Truck Ins. Exchange, Inc., supra,* 11 Cal.4th at p. 36; accord, *Brandwein v. Butler* (2013) 218 Cal.App.4th 1485, 1514-1515; *Brehm v. 21st Century Ins. Co.* (2008) 166 Cal.App.4th 1225, 1235-1237; *Progressive West Ins. Co. v. Superior Court* (2005) 135 Cal.App.4th 263, 279.)[6] "[T]he implied covenant will only be recognized to further the contract's purpose; it will not be read into a contract to prohibit a party from doing that which is expressly permitted by the agreement itself." (*Wolf, supra,* 162 Cal.App.4th at p. 1120.) "Thus, although it has been said the implied covenant finds 'particular application in situations where one party is invested with a discretionary power affecting the rights of another' [citations], if the express purpose of the contract is to grant unfettered discretion, and the contract is

---

[6]     Breach of a specific provision of the contract, however, is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing. (See *Carma Developers (Cal.), Inc. v. Marathon Development California, Inc*, *supra,* 2 Cal.4th at p. 373; *Brehm v. 21st Century Ins. Co., supra*, 166 Cal.App.4th at pp. 1235-1236.)

otherwise supported by adequate consideration, then the conduct is, by definition, within the reasonable expectation of the parties and 'can never violate an implied covenant of good faith and fair dealing.'" (*Id.* at pp. 1120-1121; see also *Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808 ["courts are not at liberty to imply a covenant directly at odds with a contract's express grant of discretionary power except in those relatively rare instances when reading the provision literally would, contrary to the parties' clear intention, result in an unenforceable, illusory agreement"].)

Relying on this court's decision in *April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, the plaintiffs contend EquiTrust's discretion was not unfettered and its failure to ensure that credited returns fulfilled their reasonable expectations of the benefit of the bonuses they were promised breached the covenant of good faith and fair dealing. In *April Enterprises* plaintiff, a ventriloquist, entered into a contract with a television station to produce a television show based on the characters he had created. The contract gave both parties the right to enter into syndication deals with third parties, with half the profits going to the other party. Under the contract, however, the station owned the show videotapes and was authorized to erase the tapes of each show six months after initial broadcast. (*Id.* at p. 814.) Some years after the contract was signed, the station erased the only copies of the programs; and the ventriloquist sued. Reversing a nonsuit judgment in favor of the station, this court held, because the contract contained conflicting terms, the station's discretion to erase the tapes had to be construed as limited by the covenant of good faith and fair dealing to allow erasure only when future syndication was not feasible. (*Id.* at pp. 816-817.)

As EquiTrust argues, *April Enterprises* is not apposite because the annuity contracts do not contain unclear or conflicting terms. The contracts specify the initial premium bonuses and guaranteed minimums bargained for by plaintiffs. There is no evidence EquiTrust violated these terms or subsequently manipulated renewal rates to deprive annuitants of credits due under the initial terms of the contracts. The evidence instead supports the conclusion the trial court reached, that is, EquiTrust complied with the rates specified in the contracts and exercised its discretion to set renewal rates and

16

caps consistently with those terms. In this respect, the credited returns were calculated within the parameters of the costs to EquiTrust of each annuity; for those annuities conferring a premium bonus—at a higher initial cost to the insurer—EquiTrust was required to hedge, or protect, its investment exposure by offering lower initial caps that adversely affected credit accumulation for the purchaser. Nothing in the contracts prohibited this approach; indeed, the contracts expressly contemplated this distinction in rates and, ultimately, credited returns.

Again, the wrong complained of by plaintiffs, the inducement to purchase the annuity contracts with the promise of a bonus that, in practice, does not accumulate to the ultimate good of the purchaser, sounds in actionable misrepresentation. (See *Eller, supra,* 778 F.3d at p. 1093.) It does not support a cause of action for breach of contract or the implied covenant of good faith and fair dealing when the insurer provides all that is promised by the contract.

2. *The Trial Court Did Not Err in Refusing To Certify Plaintiffs' UCL Unlawful Prong Cause of Action*

a. *Plaintiffs have adequately preserved this issue on appeal*

EquiTrust contends plaintiffs have forfeited the issue whether the trial court erred as a matter of law in refusing to certify the UCL cause of action due to an absence of reliance because they failed to propose an alternative class representative after Taylor was found to be inadequate. (See *Lafferty v. Wells Fargo Bank* (2013) 213 Cal.App.4th 545, 571-572 [failure to address alternative grounds for ruling forfeits appellate challenge to ruling].) Plaintiffs respond they repeatedly challenged the trial court's ruling that reliance was required and proposal of another class representative who could not demonstrate reliance would have been futile. (See *Phillips v. Sprint PCS* (2012) 209 Cal.App.4th 758, 773 ["'[w]aiver should not be found on the basis of a party's failure to undertake a futile act'"].)

The record does not support the finding of forfeiture requested by EquiTrust. Plaintiffs advised EquiTrust and the court at the time they sought leave to file the fourth amended complaint that the newly proposed class representatives would not be able to

17

testify they had relied on EquiTrust's alleged violation of section 10127.13, "as delineated by the Court at the July 6, 2011 hearing." The court never altered its position that a showing of reliance was required to state a claim under the UCL's unlawful prong. Consequently, no alternative class representatives were proposed for that particular class.

Amendments to add proper class representatives are routinely permitted. For example, in *Branick v. Downey Savings & Loan Assn.* (2006) 39 Cal.4th 235 the Supreme Court rejected defendants' argument plaintiffs should not be permitted to name a new class representative when the failure to do so in the initial complaint was not a mistake. As the Court stated, "No such rule exists. To the contrary, courts have permitted plaintiffs who have been determined to lack standing, or who have lost standing after the complaint was filed, to substitute as plaintiffs the true real parties in interest. [Citations.] Amendments for this purpose are liberally allowed." (*Id.* at p. 243; accord, *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1351, fn. 35 (*Troyk*); *CashCall, Inc. v. Superior Court* (2008) 159 Cal.App.4th 273, 288.) We see no reason why this general rule does not apply in this instance.

b. *The MVA notice on the policies did not comply with section 10127.13*

Plaintiffs premise their remaining claims on the contention the MVA was not properly disclosed as a surrender charge on the cover page of the annuities sold by EquiTrust to persons age 60 or older in violation of section 10127.13. At the time these policies were sold, section 10127.13 provided: "All individual life insurance policies and individual annuity contracts for senior citizens that contain a surrender charge period shall either disclose the surrender period and all associated penalties in 12-point bold print on the cover sheet of the policy or disclose the location of the surrender information in bold 12-point print on the cover page of the policy, or printed on a sticker that is affixed to the cover page or to the policy jacket. . . ." (Stats. 1994, ch. 984, § 4, p. 5732.)[7]

---

[7] Former section 10127.13 was repealed effective July 1, 2015 and replaced with a new section 10127.13, which provides: "(a) All individual life insurance policies and individual annuity contracts for senior citizens that contain a charge upon surrender, partial surrender, excess withdrawal, or penalties upon surrender shall contain a notice

18

The existence of surrender charges is disclosed on the cover page of the annuities sold by EquiTrust and, as permitted by section 10127.13, described in full on the "Contract Date Page" found after the annuity's table of contents. In addition to this notice, each policy contains a second advisory in a separate paragraph on the cover page. The notice states, in bold capital letters set in what appears to be a 10-point font, "CASH SURRENDER VALUES MAY INCREASE OR DECREASE BASED ON THE EQUITY INDEX AND MARKET VALUE ADJUSTMENT FEATURES OF THIS CONTRACT." The cover page does not identify the MVA as a surrender charge or disclose how the MVA operates. Indeed, EquiTrust acknowledges it did not consider the MVA to be a surrender charge and did not attempt to comply with section 10127.13 in posting this notice. (See *Eller, supra,* 778 F.3d at p. 1094 [the MVA is designed to take into account "the capital gains or losses resulting from the sale of securities needed to fund early withdrawal or surrender requests"].) Nevertheless, EquiTrust contends it substantially complied with the purpose and mandate of section 10127.13.

The sole published decision addressing whether a notice of surrender charges on the cover of an indexed annuity policy must disclose the policy's MVA is *Rand, supra,* 717 F.Supp.2d 948. There, an 86-year-old woman purchased two separate annuities from the same company, neither of which would mature until 2025, when she reached the age of 106. (*Id.* at p. 950.) Three years later her conservator surrendered one of the policies,[8] and a surrender charge and MVA were assessed, reducing the amount returned. (*Ibid.*)

disclosing the location of the charge, the charge time period, the charge information, and any associated penalty information, in bold 12-point print on the front of the policy jacket or on the cover page of the policy. [¶] (b) A policy shall have just one cover page. If the notice required by this section and the statutorily required right to examine notice are both on the cover page, as opposed to the front cover of the policy jacket, they shall appear on the same page. [¶] (c) General references to 'policy' in this section refer to both life insurance policies and annuity contracts. [¶] (d) This section shall become operative on July 1, 2015." Plaintiffs' request that we take judicial notice of two items from the legislative history of the current version of section 10127.13 is granted.

[8] Upon Rand's death, the second policy paid a death benefit to her beneficiary, the proceeds of which were also reduced by a surrender charge.

Rand's estate sued, alleging the defendant insurer had violated the UCL in part by failing to comply with section 10127.13. According to Rand, the MVA, which was not mentioned on the cover page of the policy but was described instead in a section of the policy entitled "Premiums and Cash Value Strategies," should have been disclosed on the cover page as a penalty associated with surrender of the policy. (*Id.* at pp. 953-954.)

The district court agreed, finding that "Section 10127.13 is not limited to those penalties that [the insurer] chooses to label as a 'surrender charge.' . . . Rather than simply requiring disclosure of 'all surrender charges,' the statute requires disclosure of 'all' 'penalties' 'associated' with the surrender period, which is broader than simply requiring disclosure of surrender charges. . . . The MVA operates as a penalty because it reduces or forfeits a portion of the [policy] account value in connection with any early surrender that exceeds the penalty-free amount. The MVA . . . is 'associated' with the surrender period because the MVA applies only during the surrender period stated in the contract." (*Rand, supra,* 717 F.Supp.2d at p. 956.)

While the *Rand* holding appears to be correct, EquiTrust's annuity cover page is fundamentally different from the one considered in that case. Here, the cover page of the policies contained an advisory expressly warning purchasers that "cash surrender values may increase or decrease based on the equity index *and the market value adjustment* features of this contract." (Italics added.) This language advises a purchaser that the MVA may operate as a penalty upon surrender of the policy. The cover page of the policy in *Rand* contained no such information.

Plaintiffs argue that, as a remedial statute, section 10127.13 must be adhered to strictly and that substantial compliance is insufficient when a statute mandates disclosure of consumer information. Indeed, the *Rand* court rejected the insurer's argument it had substantially complied with section 10127.13: "'[T]he doctrine of substantial compliance does not apply at all when a statute's requirements are mandatory, instead of merely directory.'" (*Rand*, *supra,* 717 F.Supp.2d at p. 961, quoting *Troyk, supra,* 171 Cal.App.4th at p. 1333.) In *Troyk* the Court of Appeal similarly rejected an insurer's argument it had substantially complied with the disclosure obligations of Insurance Code

section 381, which requires an insurance policy to state the premium charged for insurance coverage. As the *Troyk* court explained, "'"Substantial compliance, as the phrase is used in the decisions, means *actual* compliance in respect to the substance essential to every reasonable objective of the statute." [Citation.] Where there is compliance as to all matters of substance[,] technical deviations are not to be given the stature of noncompliance. [Citation.] Substance prevails over form. When the plaintiff embarks [on a course of substantial compliance], every reasonable objective of [the statute at issue] has been satisfied.' [Citation.] 'Thus, the doctrine gives effect to our preference for substance over form, but it does not allow for an excuse to literal noncompliance in every situation.' [Citation.] Furthermore, the doctrine of substantial compliance does *not* apply at all when a statute's requirements are *mandatory,* instead of merely directory. [Citations.] A mandatory statute 'is one that is essential to the promotion of the overall statutory design and thus does not permit substantial compliance.'" (*Troyk,* at pp. 1332-1333.) "Were insurers allowed, by substantial compliance or otherwise, to state all or part of a premium in documents other than a policy, those underlying purposes of section 381, subdivision (f), would not be promoted. Because section 381, subdivision (f)'s disclosure requirement is essential to the overall promotion of the statutory design, we conclude that statute's disclosure requirement is *mandatory.*" (*Id.* at p. 1333.)

Like the premium disclosure requirement at issue in *Troyk*, we agree that disclosure of the MVA's potential impact on surrender charges is "essential to the overall promotion of the statutory design," that is, to alert seniors to the adverse consequences of surrendering their policies before maturity, and is thus mandatory within the meaning of *Troyk*. While section 10127.13's purpose has been substantially accomplished by the disclosure of the potential effect of the MVA on the cover of the policy in eminently readable form (see *Costa v. Superior Court* (2006) 37 Cal.4th 986, 1026 ["courts have taken a realistic and practical view of the consequence of relatively minor statutory lapses, refusing, for example, to withhold a measure from the ballot because of the theoretical possibility that a smaller type size in a title might have affected potential

21

signers when the actual type size utilized was not unduly small and was clearly readable"]; *Assembly v. Deukmejian* (1982) 30 Cal.3d 638, 652 ["technical deficiencies in referendum and initiative petitions will not invalidate the petitions if they are in 'substantial compliance' with statutory and constitutional requirements"]), the failure to present the notice in the mandated 12-point font is not its only defect. As might be expected in light of EquiTrust's assertion the MVA does not constitute a true surrender charge, the notice does not advise a senior purchaser of those circumstances in which the MVA will impose a surrender penalty or identify where in the policy that information may be found, as required by section 10127.13. In fact, very little information is provided in the policy other than the formula used to calculate the MVA, which is set forth in the general definitions (rather than on the contract data page) and is identified as $(1 + s) / (1 + c + 0.005)^{n/12}$, where *s* is the starting Treasury Rate, *c* is the Treasury Rate for the remaining period at withdrawal or surrender and *n* is the number of complete months until the end of the surrender period.

EquiTrust points out that this algebraic formula is unlikely to mean *anything* to the average—or even educated—purchaser, and disclosure of the formula's effect is more than sufficient. This argument is belied, however, by EquiTrust's own description of the MVA in disclosures provided to agents to review with purchasers at the point of sale. The information contained in EquiTrust's single-page disclosure identifies the MVA formula as $[(1 + s) / (1 + c + 0.005)]^{n/12} - 1$ (emphasis added; the - 1 is omitted in the policy's version of the formula)[9] and gives detailed examples of its operation, including instances in which it would increase the surrender charge. This information could have been included on the contract data page, and the mandate of the statute would have been met.

---

[9]     The discrepancy between the two versions of the formula is not explained in the record; but EquiTrust filed a post-argument letter brief demonstrating the two different formulas, when properly understood and applied, yield identical results. Plainly, however, the discrepancy undermines any argument the policy cover page complies with section 10127.13's statutory mandate.

c. *Plaintiffs failed to satisfy the standing requirement applicable to their UCL cause of action*

The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) In 2004 California voters "materially curtailed the universe of those who may enforce" the UCL by enacting Proposition 64. (*Kwikset, supra,* 51 Cal.4th at p. 320.) Proposition 64 limited private standing under the UCL to any "'''person who has suffered injury in fact and has lost money or property''' as a result of unfair competition." (*Kwikset*, at pp. 20-321*.,* quoting Bus. & Prof. Code, § 17204.) "'The phrase "as a result of" in its plain and ordinary sense means "caused by" and requires a showing of causal connection or reliance. . . .'" (*Id*. at p. 326.) Thus, in order to pursue a claim under the UCL, a plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that the economic injury was the result of, i.e., *caused by,* the unfair business practice . . . that is the gravamen of the claim." (*Kwikset*, at p. 322; accord, *Sarun v. Dignity Health* (2014) 232 Cal.App.4th 1159, 1166.)

The question presented here is whether, absent an allegation she read the policy cover page, any of the senior plaintiffs could represent the proposed class on the claim EquiTrust's policy violated the requirements of section 10127.13.[10] The trial court concluded they could not. We agree.

_____

[10]    In *Tobacco II, supra,* 46 Cal.4th 298 the Supreme Court addressed the impact of Proposition 64's standing requirement on UCL class actions. *Tobacco II* involved a class action brought by smokers against the tobacco companies alleging the companies' marketing and advertising violated the UCL. After Proposition 64 was enacted, the trial court decertified the class, finding that each absent class member was now required to show they suffered an injury in fact as a result of the alleged unfair competition. (*Id.* at p. 306.) Reversing the decertification order, the Supreme Court held that Proposition 64 "was not intended to, and does not, impose [Business and Professions Code] section 17204's standing requirements on absent class members in a UCL class action where class requirements have otherwise been found to exist." (*Id.* at p. 324.) Thus, "relief under the UCL is available [to absent class members] without individualized proof of deception, reliance and injury" so long as the class representative meets Proposition 64

In *Tobacco II* the Court emphasized that its "discussion of causation in this case is limited to such cases where, as here, a UCL action is based on a fraud theory involving false advertising and misrepresentations to consumers. . . . There are doubtless many types of unfair business practices in which the concept of reliance, as discussed here, has no application." (*Tobacco II, supra*, 46 Cal.4th at p. 325, fn. 17.) In *Kwikset, supra,* 51 Cal.4th 310 the Court extended the reasoning of *Tobacco II* to claims brought under the unlawful prong when the alleged unlawful conduct is that the defendant engaged in misrepresentations and deception. (*Kwikset*, at p. 326, fn. 9, citing *Durell v. Sharp Healthcare* (2010) 183 Cal.App.4th 1350, 1363; accord, *Hale v. Sharp Healthcare* (2010) 183 Cal.App.4th 1373, 1385.) As the *Durell* court explained, "[a] consumer's burden of pleading causation in a UCL action should hinge on the nature of the alleged wrongdoing rather than the specific prong of the UCL the consumer invokes." (*Durell,* at p. 1363.)

Plaintiffs contend that neither *Tobacco II* nor *Kwikset* requires a showing of reliance here and urge us to follow the decision in *Medrazo, supra,* 205 Cal.App.4th 1. There, the plaintiff sued a motorcycle dealer under the UCL, alleging it had violated provisions of the Vehicle Code forbidding the sale of motorcycles without hanger tags providing specified pricing information. (*Medrazo*, at pp. 4-5.) Although the pricing information was ultimately disclosed to the purchaser once she decided to buy the motorcycle, the motorcycle she bought had not been outfitted with the required tag. (*Id.* at pp. 7-8.) The trial court concluded the plaintiff lacked standing to sue under the unlawful prong because she failed to demonstrate she had relied on the tag in making the decision to purchase the motorcycle. (*Id.* at p. 9.)

Division Four of this court reversed. The court concluded the plaintiff had suffered "a concrete, particularized, and actual invasion of an interest legally protected by [the Vehicle Code], i.e., the disclosure—*before a decision to purchase a specific motorcycle is made* —of the MSRP and any dealer-added charges for all new

standing requirements. (*Id.* at p. 320, *see also Medrazo, supra,* 205 Cal.App.4th at p. 11 ["[w]hen the private action is brought as a class action, only the named plaintiff is required to meet this standing requirement"].)

24

motorcycles offered for sale." (*Medrazo, supra,* 205 Cal.App.4th at p. 13.) As the court observed, the statute was "'designed to provide . . . motorcycle buyers with information that is necessary to make a wise purchase.'" (*Ibid.*) The absence of the tag deprived the purchaser of information the Legislature had deemed necessary for an informed purchasing decision.

Although *Medrazo* has been criticized for reaching beyond the four corners of *Tobacco II* and *Kwikset* (see, e.g., *Kane v. Chobani, Inc.* (N.D. Cal. 2014) 973 F.Supp.2d 1120, 1131), we believe it was correctly decided based on the specific facts presented, which constituted one of the "types of unfair business practices in which the concept of reliance. . . has no application" envisioned by the Supreme Court in *Tobacco II*. (See *Tobacco II, supra,* 46 Cal.4th at p. 325, fn. 17.) Medrazo's injury was caused by the absence of the tag, and she had no opportunity to review the information a tag would have conveyed before she decided to buy that particular motorcycle. As plaintiffs have argued, inserting a reliance requirement in this setting would have subverted the purpose of the law and encourage rather than "'suppress the mischief at which [the statute] is directed.'" (*Rand, supra,* 717 F.Supp.2d at p. 957.)

The same situation does not exist here, however. In what is almost the reverse of the facts in *Medrazo*, the plaintiffs here were shown a comprehensive notice disclosing the existence and operation of the MVA before they made the decision to purchase an EquiTrust annuity. After the purchase was completed, each received a copy of the policy, which contained the defective cover page advising she had 30 days to rescind. Not one of the plaintiffs was able to assert she had reviewed the cover page when given the opportunity. In this instance the absence of the necessary information was irrelevant to the decision to purchase the selected policy. These facts more closely resemble those in *Durell*, *supra,* 183 Cal.App.4th 1350 in which the court affirmed dismissal of the plaintiff's UCL claim when the plaintiff could not allege he had ever visited the defendant's website and read the alleged misrepresentation. (*Durell*, at p. 1363; see also *Jenkins v. JPMorgan Chase Bank, N.A.* (2013) 216 Cal.App.4th 497, 523 [rejecting UCL standing of plaintiff whose foreclosure was not triggered by alleged unlawful acts].) As

25

one court succinctly stated, "[a] plaintiff fails to satisfy the causation prong of the statute if he or she would have suffered 'the same harm whether or not a defendant complied with the law.'" (*Daro v. Superior Court* (2007) 151 Cal.App.4th 1079, 1099.)  Plaintiffs have failed this crucial test.

In reaching this conclusion, we do not condone marketing tactics that appear to have generated sales of indexed annuities to unsuitable clients.  Nonetheless, the trial court did not err in finding plaintiffs' failure to allege they had reviewed the defective notices barred their claim under the UCL.

3.  *The Declaratory Relief Cause of Action Also Fails*

Declaratory relief is available to "[a]ny person interested under a written instrument . . . who desires a declaration of his or her rights or duties with respect to another, or in respect to, in, over or upon property . . . in cases of actual controversy relating to the legal rights and duties of the respective parties. . . ."  (Code Civ. Proc., § 1060; *Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 728 ["[a] complaint for declaratory relief is legally sufficient if it sets forth facts showing the existence of an actual controversy relating to the legal rights and duties of the respective parties under a written instrument and requests that these rights and duties be adjudged by the court"]; accord, *Graham v. Bank of America, N.A.* (2014) 226 Cal.App.4th 594, 615.)  In light of our conclusion EquiTrust did not breach the provisions of its policies, there is no actual controversy warranting our intervention.

## DISPOSITION

The orders of the trial court are affirmed.  EquiTrust is to recover its costs on appeal.


PERLUSS, P. J.

We concur:



ZELON, J.                                    SEGAL, J.

26

# EquiTrust

**EquiTrust Life Insurance Company®**
West Des Moines, Iowa

Executive Office

5400 University Avenue

West Des Moines, Iowa 50266-5997
1-866-598-3692

Financial Services
In this Contract, "you" or "your" will refer to the Owner and "we", "our", or "us" will refer to EquiTrust Life Insurance Company®, a stock company.

We will pay the Proceeds of this Contract according to the terms of the Contract. The Proceeds will provide a monthly income, or other settlement, in accordance with the Payment Plan selected. The terms of this Contract are contained on this and following pages.

READ YOUR CONTRACT CAREFULLY. This is a legal Contract between you, the Owner, and us, the Insurer.

### RIGHT TO EXAMINE AND RETURN THIS CONTRACT

**Right to cancel.** If you are not satisfied, you may cancel your Contract by returning it within 30 days after the date you receive it. Mail or deliver it to us at the address shown above or to your agent. (If you return the Contract by mail, it will be deemed returned when postmarked, properly addressed, and postage prepaid.) This Contract will then be void from its start. Any premium paid will be refunded.

## SURRENDER CHARGE INFORMATION CAN BE FOUND ON PAGE 3 OF THIS CONTRACT.

### IMPORTANT NOTICE TO OWNERS AGE 60 AND OLDER

YOU HAVE PURCHASED AN ANNUITY CONTRACT. CAREFULLY REVIEW IT FOR LIMITATIONS.

THIS CONTRACT MAY BE RETURNED WITHIN 30 DAYS FROM THE DATE YOU RECEIVED IT FOR A FULL REFUND BY RETURNING IT TO THE INSURANCE COMPANY OR AGENT WHO SOLD YOU THIS CONTRACT. AFTER 30 DAYS, CANCELLATION MAY RESULT IN A SUBSTANTIAL PENALTY, KNOWN AS A SURRENDER CHARGE. THE SURRENDER CHARGES ASSOCIATED WITH THIS CONTRACT CAN BE FOUND ON THE CONTRACT DATA PAGE.

This Contract is signed by us as of its Contract Date.

_____                    _____
President                                                  Secretary

---

**SINGLE PREMIUM FIXED AND EQUITY INDEX DEFERRED ANNUITY CONTRACT**

Annuity benefit payable at Income Date.
Death benefit payable in event of the Owner's death prior to Income Date.

CASH SURRENDER VALUES MAY INCREASE OR DECREASE BASED ON THE EQUITY INDEX AND MARKET VALUE ADJUSTMENT FEATURES OF THIS CONTRACT. THE INITIAL INTEREST RATES FOR THE FIXED RATE ACCOUNT ARE FOR ONE YEAR ONLY. WHILE CONTRACT VALUES MAY BE AFFECTED BY AN EXTERNAL INDEX, THE CONTRACT DOES NOT DIRECTLY PARTICIPATE IN ANY STOCK, BOND OR EQUITY INVESTMENTS.

### NONPARTICIPATING

ET-MPP-2000(02-05)                    CA

27